In re Inquiry Concerning a Judge, the
Honorable David S. YOUNG,
District Judge.

No. 970032.

Supreme Court of Utah.

Jan. 22, 1999.

Steven H. Stewart, Francis M. Wikstrom, Salt Lake City, for Judicial Conduct Commission.

Daniel L. Berman, Peggy A. Tomsic, D. Frank Wilkins, Salt Lake City, for Judge Young.

Brent M. Johnson, Richard H. Schwermer, Margaret K. Gentles, Salt Lake City, for amici Utah Judicial Council and Administrative Office of the Courts.

M. Gay Taylor, Robert H. Rees, Salt Lake City, for amici legislative members of Judicial Conduct Commission.

Jan Graham, Att'y Gen., Annina M. Mitchell, Asst. Att'y Gen., Salt Lake City, for amici Governor Leavitt and Attorney General Graham.

On Petition for Rehearing

ZIMMERMAN, Justice:

¶ 1   This matter is before us on a petition for rehearing. The original decision in this case was handed down on July 10, 1998, and was published as *In re Young*, 961 P.2d 918 (Utah 1998) (hereinafter referred to as "original opinion").[1] In that decision, we held that sections 78–7–27(1)(a) and (b) of the Code were violative of article V, section 1 of the Utah Constitution. Those Code subsections provide that two members of the Senate, appointed by the President, and two members of the House, appointed by the Speaker, shall serve on the ten-member Judicial Conduct Commission. As a consequence, we held void proceedings of the commission that led it to recommend that this court enter a public sanction against Judge David S. Young.

¶ 2   The Judicial Conduct Commission moved for permission to file a petition for rehearing. This court granted the motion, as well as the motions of various parties for permission to file briefs as amici curiae in

---

1.  The original opinion was withheld from publication in West Publishing Company's bound volumes in late November of 1998. Today it is released as an appendix to this case.

support of the petition for rehearing.[2] The respondent, Judge Young, filed an opposition to the petition for rehearing. Oral argument was held on December 21, 1998. We now grant the petition and issue this opinion on rehearing.

¶ 3 The petition for rehearing and the briefs of the various amici have raised several issues of substantial import. First and foremost, the amicus brief of the legislative members of the Judicial Conduct Commission has brought to our attention much new material about the origins of the present judicial article of the Utah Constitution, article VIII, which was rewritten in its entirety and passed by the voters in 1984. Section 13 of that article elevated the Judicial Conduct Commission to constitutional status. The legislator amici contend that this new material demonstrates that the drafters of the amended article, the judges who participated in the hearings preceding its being finalized, the legislators who then passed the proposed amendment and put it on the ballot, and the voters who approved it at a general election all understood that the amended article contemplated legislative participation on the Judicial Conduct Commission. Therefore, they argue, our original decision holding such participation unconstitutional was in error.

¶ 4 The objective importance of this historical material cannot be overstated. The petition of the Judicial Conduct Commission for rehearing had narrowly asked only that we declare whether the commission can continue to function without the legislative members. But at oral argument, the chair of the commission, who previously had been unaware of the historical materials provided us by the amici, apologized for failing to bring this critical material to our attention in the original proceeding. He also announced in open court that he was now convinced that our original decision was wrong and should be reversed.

¶ 5 The second issue presented by some of the briefs, particularly that of the Governor and the Attorney General, as well as that of the Utah Judicial Council and the Administrative Office of the Courts, is a concern that the original opinion's language about separation of powers was sufficiently broad to bring into question the constitutionality of many boards, task forces, working groups, advisory committees, and commissions on which members of more than one of the three branches of government sit together. In particular, they urge us to declare that groups with such joint representation that do not exercise "core" or "primary" functions of one branch of government do not fall under the ban of the second clause of article V, section 1. These amici ask that we clarify our original opinion as to the sorts of joint activities that are permissible so that the three branches of government can continue to work together on matters of common concern.

¶ 6 We are persuaded by the briefs and argument that the original opinion should be vacated to the extent that it is inconsistent with this one, and that legislative membership on the Judicial Conduct Commission should be held constitutional. As a preface to a discussion of the merits of the petition for rehearing, we review the analytical approach for determining constitutionality under article V, section 1. We then summarize the core analysis from our original opinion that led us to declare sections 78–7–27(1)(a) and (b) unconstitutional.

¶ 7 Article V, section 1, the separation of powers provision of the Utah Constitution, provides:

2. The parties filing amicus curiae briefs were the legislative members of the Judicial Conduct Commission; the Governor, Michael O. Leavitt, and Attorney General Jan Graham; and the Utah Judicial Council and the Administrative Office of the Courts.

The legislative members of the Judicial Conduct Commission also moved the court for permission to intervene as parties, contending that after the original opinion was issued, they were no longer considered part of the commission and that their views were not represented by the narrow petition for rehearing filed by the commission. The court today denies the motion for intervention. The only parties to this matter are Judge Young and the Judicial Conduct Commission, as an entity. The commission's individual members have no separate status as parties. However, today we vacate the original opinion's holding that legislative members cannot serve on the commission. Therefore, the reasons that led those members to seek status as parties no longer exist.

[i] The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and [ii] no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in the cases herein expressly directed or permitted.

Utah Const. art. V, § 1 (bracketed material added). As indicated by the brackets in the text, this section is divided into two clauses. The first states the general separation of powers principle, and the second very specifically prohibits the exercise of certain functions of one branch by one charged with the exercise of certain powers of another branch. In the present case, the briefing and argument in both the original proceeding and on rehearing have focused exclusively on the second clause of article V, section 1. Our original opinion held that this clause was violated by sections 78–7–27(1)(a) and (b).

¶ 8 The analytical model derived from the second clause of article V, section 1 can be stated as a relatively straightforward three-step inquiry. First, are the legislators in question "charged with the exercise of powers properly belonging to" one of the three branches of government? Second, is the function that the statute has given the legislators one "appertaining to" another branch of government? The third and final step in the analysis asks: if the answer to both of the above questions is "yes," does the constitution "expressly" direct or permit exercise of the otherwise forbidden function? If not, article V, section 1 is transgressed. Utah Const. art. V, § 1. We applied this analytical model in our original opinion, and we do so again today in determining both the permissibility of legislators serving on the Judicial Conduct Commission and the permissibility of the President of the Senate and the Speaker of the House appointing two members each to the commission.

¶ 9 There was no question then, and there is no question today, that the answer to the first question is "yes." Legislators alone are charged with the exercise of the essential powers inherent in the very concept of the legislative branch—the power to vote on proposed laws. *See Tite v. State Tax Comm'n,* 89 Utah 404, 413, 57 P.2d 734, 738 (1936) (finding that only legislature has authority to pass laws fixing tax penalties); *see also Rampton v. Barlow,* 23 Utah 2d 383, 464 P.2d 378, 381 (1970) (" 'Legislative power . . . is the authority to make laws.' " (quoting *In re Opinion of Justices,* 302 Mass. 605, 19 N.E.2d 807 (1939))). This is true of both the legislators appointed to the commission and the legislators appointing them. With similar certainty, we found in the original opinion and we find today that the answer to the third question is "no." The Utah Constitution contains no express provision directing or permitting service by legislators on the commission, nor is there any provision directing or permitting the President and the Speaker to appoint members of the Judicial Conduct Commission. Therefore, the resolution of this case depends entirely upon the answer to the second question: (i) As it applies to those serving on the commission, are the functions the legislators are called upon to perform as members of the Judicial Conduct Commission functions "appertaining to" the judicial branch? (ii) As it applies to the President and the Speaker, is the function they perform when appointing members of the commission "appertaining to" the executive branch? In the original opinion, we answered these questions in the affirmative. Based on historical and contextual information recently brought to our attention, we reach a different result today.

¶ 10 In our original opinion, we concluded with relatively little analysis that the function performed by the Judicial Conduct Commission was one "appertaining to" the judicial branch of government. Original op. ¶ 84. Therefore, we found that it was a violation of article V, section 1 for legislators to sit on a commission exercising an exclusive judicial branch function. *Id.* ¶ 89. We also found that because the members of the commission performed a function "appertaining to" the judicial branch, the power to appoint those members constitutionally belonged to the

Governor[3] unless the constitution "expressly directed or permitted" someone else to make the appointments. Because the constitution did not, we held that the statute giving that power to the President of the Senate and the Speaker of the House violated article V, section 1. Although it was central to our decision, we did not explain at any length why the function performed by the Judicial Conduct Commission was exclusively judicial in nature. We merely made the observation that the commission exercises a "type of judicial authority" and was established by the judicial article, article VIII. *Id.* ¶ 85. Yet the analytical soundness of our original opinion hangs entirely upon the correctness of this fundamental premise.[4]

¶ 11 Before we revisit this issue, we briefly address the language of the second clause of article V, section 1. As noted, the critical constitutional language is "powers properly belonging to" one branch and "functions appertaining to" either of the other two. Neither phrase is plain in its meaning, particularly when considered in the context of the real world of government. Taken together, these phrases could be read broadly to encompass all powers and functions given to a branch or its officers by the literal language of the constitution, by statute, and by tradition. On the other hand, they could be read narrowly and reach only certain powers that are essential to the very existence of a branch's minimally fulfilling its conceptual role as part of a three-department system of government.

¶ 12 Perhaps because of the ambiguity of the language, which becomes acute in the context of the real world, our case law stretching back over the past century seldom, if ever, has attempted to decide cases based on a literalistic approach to the language of the second clause. Indeed, few of our cases ever discuss the language "properly belonging to" and "appertaining to" in any detail. *See, e.g., Thatcher v. Industrial Comm'n*, 115 Utah 568, 207 P.2d 178, 181 (1944) (finding that it would be "fruitless and unwise" to delineate which powers properly belong to or appertain to the different branches); *Taylor v. Lee*, 119 Utah 302, 312, 226 P.2d 531, 536 (1951) (finding that many powers do not properly belong to a single branch); *see also Salt Lake City v. Ohms*, 881 P.2d 844, 848–49 (Utah 1994) (not discussing whether the legislature performed a function "properly belonging to" or "appertaining to" another branch when deciding a separation of powers issue); *Matheson v. Ferry*, 641 P.2d 674, 678–79 (Utah 1982) (discussing violations of separation of powers based on the exercise of effective control over another department rather than on whether one department exercised a power "properly belonging to" or "appertaining to" another department) (hereinafter *Matheson I*); *Mutart v. Pratt*, 51 Utah 246, 250–51, 170 P. 67, 68–69 (1917) (deciding that legislature does not impinge upon judiciary by giving no discretion in sentencing without deciding whether this is a power "properly belonging to" or "appertaining to" the judiciary); *In re Handley's Estate*, 15 Utah 212, 221, 49 P. 829, 831 (1897) (not relying on whether legislature performed a function "properly belonging to" or "appertaining to" judiciary in finding that legislature impinged on judiciary by passing a law changing result of a judicial decision). Rather, we have, *sub silentio*, treated the two phrases as equivalent and have sought to articulate the concepts they embrace by considering the basic notions underlying the separation of powers doctrine as it has grown up over the centuries and by an examination of the practical operation of government.

¶ 13 The textual justification for this approach was alluded to in *Taylor v. Lee*, 119 Utah 302, 312, 226 P.2d 531, 536 (1951):

We call attention to the use of the phrase "exercise of powers *properly* belonging to one of these departments" (emphasis added), ... The qualified expression indicates the members of the Constitutional Convention must have considered that there were powers which were not so inherently a part

---

3. Article VII, section 10 provides that the Governor shall "appoint all State and district officers whose offices are established by this Constitution, or which may be created by law, and whose appointment or election is not otherwise provided for." Utah Const. art. VII, § 10.

4. Justice Stewart in his dissent from today's decision still refuses to address this pivotal question analytically. Instead, he simply asserts, without authority, that the function performed by the commission is an exclusively judicial one that brings it within the reach of article V, section 1.

of one department that other departments would be forever precluded from exercising those which were necessary to a proper functioning of that particular department.

*Id.* (emphasis in original). It is just this sort of judgment about what is so inherent in a branch that it cannot be exercised by another and what is not so inherent to one that it can be exercised by several that our cases have striven to determine over the years. An excellent example of this mode of analysis is presented in *Tite v. State Tax Commission,* 89 Utah 404, 57 P.2d 734 (1936). And the spirit of this approach was well expressed when the *Tite* court quoted the following:

"The absolute independence of the three branches of government which was advocated by Montesquieu has not been found entirely practicable, and, although the threefold division of powers is the basis of the American Constitution, there are many cases in which the duties of one department are to a certain extent devolved upon and shared by the other."

*Id.* at 737 (quoting *Bouvier's Dictionary* (Rawles 3d Rev.), at 1114). The *Tite* court also observed that although

"the executive, legislative and supreme judicial powers of the government ought to be forever separate and distinct, it is also true that the science of government is a practical one; therefore, while each should firmly maintain the essential powers belonging to it, it cannot be forgotten that the three co-ordinate parts constitute one brotherhood, whose common trust requires a mutual toleration of the occupancy of what seems to be a 'common cause of vicinage' bordering the domains of each."

*Id.* (quoting *Brown v. Turner,* 70 N.C. 93 (1874)).

¶ 14 From a survey of our cases the most that can be said categorically is that for powers or functions to fall within the reach of the second clause of article V, section 1, they must be "so inherently legislative, executive or judicial in character that they must be exercised exclusively by their respective departments." *Taylor v. Lee,* 119 Utah 302, 315, 226 P.2d 531, 537 (1951). In defining the functions or powers which are

exclusive to one department, we have also used the terms "primary," "core," or "essential." *See Salt Lake City v. Ohms,* 881 P.2d 844, 849 (Utah 1994); *Timpanogos Planning & Water Management Agency v. Central Utah Water Conservancy Dist.,* 690 P.2d 562, 567 (Utah 1984); *State v. Gallion,* 572 P.2d 683, 688 (Utah 1977). But we have never been willing to be more precise than this. *See Thatcher v. Industrial Comm'n,* 115 Utah 568, 207 P.2d 178 (1944). A necessary corollary to the doctrine that some powers or functions belong exclusively to the members of one branch is that there must be powers and functions which may, in appearance, have characteristics of an inherent function of one branch but which may be permissibly exercised by another branch. *See Matheson I,* 641 P.2d 674, 676 (Utah 1982) (holding that narrowing of field of potential judicial appointees before governor appoints partakes of elements of the appointment power, but is not so inherently an executive function as to preclude participation by the legislative branch in that narrowing); *see also Taylor v. Lee,* 119 Utah 302, 226 P.2d 531 (1951); *Tite v. State Tax Comm'n,* 89 Utah 404, 57 P.2d 734 (1936). We conclude that when the power exercised or the function performed is one that we determine is not exclusive to a branch, it is not "appertaining to" that branch and does not fall within the reach of the second clause of article V, section 1.

¶ 15 With this background in mind, we address the historical and textual materials that have now been brought to our attention to determine what light they shed on the question of whether the function performed by legislators on the commission is one "appertaining to" the judicial branch. It is argued on rehearing by counsel for Judge Young that we should limit ourselves to the plain language of the constitution and that we should therefore not consider the history of article VIII, section 13. But the plain language is of marginal help on this question. And in such circumstances, we have rejected any such rigid rule of constitutional interpretation. In *Society of Separationists v. Whitehead,* 870 P.2d 916 (Utah 1993), we made it plain that in interpreting the constitution, we consider all relevant factors, including the language, other provisions in the constitution that may bear on the matter,

historical materials, and policy. *See id.* at 920–21, 921 n. 6. Our primary search is for intent and purpose. Consistent with this view, this court has a very long history of interpreting constitutional provisions in light of their historical background and the then-contemporary understanding of what they were to accomplish.[5] This case, like many others, proves the wisdom of the axiom that "[a] page of history is worth a volume of logic." *Society of Separationists*, 870 P.2d at 921.

¶ 16 The history of article VIII as a whole is a fascinating study of the conflict between the executive and legislative branches. The struggle began when the legislative branch insisted on input in the selection and confirmation process for judges and the executive resisted. The judicial branch was left to settle several confrontations in this struggle. *See Matheson I*, 641 P.2d 674, 676–77 (Utah 1982) (finding that the presence of "two legislative appointees on a seven-member judicial nominating commission is constitutionally accommodated and does not necessarily violate Article V, § 1," but that adding Senate confirmation of gubernatorial appointees to legislative participation on the nominating commission "tips the scale" and violates first clause of article V, section 1); *Matheson v. Ferry*, 657 P.2d 240 (Utah 1982)

(finding Senate confirmation of judges impermissible in all cases except for juvenile court appointments) (hereinafter *Matheson II* ). Those cases did not end the matter. Rather, they precipitated a complete rewrite of the judicial article of the Utah Constitution that finally settled this dispute and several other long-standing issues with a set of wide-ranging compromises that brought all interested parties to the table. *See Utah Const. Revision Comm'n Rep.*, 15–16 (Jan.1984) (delineating goals of Constitutional Revision Commission to improve functioning of judicial branch and noting that all interested groups were consulted in the processes leading to the drafting of the article). The rewritten judicial article of the Utah Constitution, inter alia, restructured the selection and discipline provisions of the constitution and for the first time constitutionalized both the preexisting judicial nominating commission process and the Judicial Conduct Commission. For today's purposes, we limit our discussion to the background of section 13 of the new article VIII, the section concerning the Judicial Conduct Commission.

¶ 17 The Judicial Conduct Commission did not spring into life with the drafting of section 13. It preexisted the 1984 constitutional provision. The entity that is the Judicial Conduct Commission had its origins in

5. *See In re Worthen*, 926 P.2d 853, 866–67 (Utah 1996) (while constitutional language is starting place for analysis of constitutional provision, "[w]e have also stated that other provisions dealing generally with the same topic [such as] historical evidence ... supported by independent research materials assist us in arriving at a proper interpretation of the constitutional provision in question"); *West v. Thomson Newspapers*, 872 P.2d 999, 1013 (Utah 1994) (beginning analysis of article I, section 15 of Utah Constitution by examining its historical background); *P.I.E. Employees Fed. Credit Union v. Bass*, 759 P.2d 1144, 1146 (Utah 1988) (examining debates at Constitutional Convention in interpreting Utah Constitution); *American Fork City v. Crosgrove*, 701 P.2d 1069, 1072–73 (Utah 1985) (looking to framers' intent to determine policies behind Constitution's proscription against required self-incrimination); *Utah Farm Bureau Ins. Co. v. Utah Ins. Guar. Ass'n*, 564 P.2d 751, 753–54 (Utah 1977) ("In seeking the correct application of ... constitutional provisions, this court looks to the circumstances[ ] which brought them into being and the purposes sought to be accomplished."); *State v. Betensen*, 14 Utah 2d 121, 378 P.2d 669, 669–70 (1963) (upon finding constitutional provi-

sion uncertain, looking to history to interpret article VIII, section 10 of Utah Constitution); *University of Utah v. Board of Exam'rs*, 4 Utah 2d 408, 295 P.2d 348, 361–62 (1956) ("[I]f the words are ambiguous or their meaning not clear, or if the several provisions of the basic instrument are susceptible to two or more possible meanings or constructions, then it is proper to look outside the instrument itself to ascertain what the framers meant by the language used."); *Spence v. Utah State Agr. College*, 119 Utah 104, 225 P.2d 18, 23 (1950) (" 'We are restricted to this definition because of another canon of constitutional construction that terms used in the constitution must be taken to mean what they meant to the minds of the voters of the state when the provision was adopted.' " (quoting *Tintic Standard Mining Co. v. Utah County*, 80 Utah 491, 15 P.2d 633, 637 (1932))); *Richardson v. Treasure Hill Mining Co.*, 23 Utah 366, 391, 65 P. 74, 81 (1901) (examining framers' discussions to reach their intent and to interpret Utah Constitution); *State v. Norman*, 16 Utah 457, 52 P. 986, 990–91 (1898) (taking judicial notice of proceedings at Constitutional Convention in determining purpose of constitutional provision).

1971. Section 38, 1971 Utah Laws 113, established a commission concerning judicial qualifications. It is worth describing at length because of the near identity, in concept and language, of the original 1971 statute and section 13 of article VIII.[6] The commission established in 1971 was composed of five members, three from the board of commissioners of the Utah State Bar and two legislators, one each appointed by the President and the Speaker. The commission was empowered to investigate complaints against judges, hold hearings, take evidence, and make recommendations to the Supreme Court for "removal, suspension, censure, reprimand or retirement." The grounds listed in the statute for removal, suspension, censure, or reprimand were as follows:

   (a) Willful misconduct in office ...; or

   (b) Final conviction of a crime punishable as a felony under state or federal law; or

   (c) Persistent failure to perform his duties; or

   (d) Habitual use of alcohol or drugs which interferes with the performance of his judicial duties.

1971 Utah Laws 113, § 38(2). A separate subsection provided for the involuntary retirement of a judge for "disability seriously interfering with the performance of his duties." 1971 Utah Laws 113, § 38(4). The statute further provided that upon receipt of such a recommendation from the commission, the Supreme Court was to review the record of the proceedings on the law and facts. The Supreme Court was free to permit the introduction of additional evidence. After review, the court was required to "enter its order implementing the commission recommendation, or modifying or wholly rejecting the recommendation, as it finds just and proper." 1971 Utah Laws 113, § 38(5).

¶ 18 Between 1971 and 1983, the statute creating the commission was amended several times. There was, however, no significant change in language or concept. Most of these amendments related to a realignment of membership. In 1975, for example, the number of legislators on the commission was increased to three and the total membership to six. In 1977, the membership was increased to seven, and four of them were to be legislators. In 1983, the membership was increased to nine with the two new members being appointees of the Governor. Also in 1983, the name of the commission was changed to the Judicial Conduct Commission. Thus, by the time the new judicial article was drafted, there was a thirteen-year history of a judicial conduct commission that was not the province of any one branch of government. Rather, it started out as a joint exercise of the judicial and legislative branches (in the form of the state bar commissioners) and, by the end, had evolved into an exercise in shared power by all three branches of government. Throughout, the commission remained a group making nonbinding recommendations to the Supreme Court.

¶ 19 A comparison of the constitutional Judicial Conduct Commission in section 13 of article VIII and the statutory Judicial Conduct Commission shows that the former is a virtual copy of the latter, down to the phrasing of the grounds for discipline

---

6. Article VIII, section 13 states:
   A Judicial Conduct Commission is established which shall investigate and conduct confidential hearings regarding complaints against any justice or judge. Following its investigations and hearings, the Judicial Conduct Commission may order the reprimand, censure, suspension, removal, or involuntary retirement of any justice or judge for the following:
   (1) action which constitutes willful misconduct in office;
   (2) final conviction of a crime punishable as a felony under state or federal law;
   (3) willful and persistent failure to perform judicial duties;
   (4) disability that seriously interferes with the performance of judicial duties; or

   (5) conduct prejudicial to the administration of justice which brings a judicial office into disrepute.
   Prior to the implementation of any commission order, the Supreme Court shall review the commission's proceedings as to both law and fact. The court may also permit the introduction of additional evidence. After its review, the Supreme Court shall, as it finds just and proper, issue its order implementing, rejecting, or modifying the commission's order. The Legislature by statute shall provide for the composition and procedures of the Judicial Conduct Commission.
   Utah Const. art. VIII, § 13.

and the rather unique structural relationship between the commission and the Supreme Court. The constitutional provision is briefer; it left the details of procedure and commission composition to be fixed by the statute, as is appropriate in good constitution drafting. Instead, section 13 simply stated, "The Legislature by statute shall provide for the composition and procedures of the Judicial Conduct Commission." · Utah Const. art. VIII, § 13. But despite the minor differences, it seems plain that the Constitutional Revision Commission intended the commission to remain an entity exercising powers available to be shared by other branches of government.

¶ 20 It is also clear that the legislature assumed the commission would exercise a function that was permissible to members of branches other than the judicial. The sponsor of the resolution placing the amended article VIII on the ballot was Representative James Moss, who was a member of the statutory Judicial Conduct Commission. He addressed section 13 on the floor of the House during debates and spoke to the question of membership on the commission.

> Section 13 deals with the establishment and constitutional foundation of a judicial conduct commission. Representative Ted Lewis and myself serve as your representatives on the state judicial conduct commission by appointment from the Legislature. Senator Cornaby and Senator Black serve from the Senate on that commission and we have been meeting on a regular basis. I will tell you that it is an active group that considers, in private and strict confidentiality, a number of matters that come before us to consider the quality and the potential for problems that judges may have. It is a very important tool that the Supreme Court can use in dealing with reprimanding, the discipline, and possible removal of judges within the system entirely apart from the unopposed retention election. It has the power of reprimand, censure, suspension, removal, and voluntary and involuntary retirement of judges.

Floor Debate, Statement of Rep. James Moss, 45th Utah Leg., 2d Spec. Sess. (March 27, 1984) (House recording no. 9).

¶ 21 Finally, the voters to whom the amendment was presented were told that this was to be a commission upon which legislators and others would sit. The impartial analysis in the 1984 voter information pamphlet stated in part as follows:

> The proposal also provides for the constitutional establishment of a judicial conduct commission to review complaints and order disciplinary action against judges. *The judicial conduct commission is composed of lawyers, legislators and lay citizens.*

David S. Monson, *Utah Voter Information Pamphlet* 15 (1984) (emphasis added). This language is of course inconsistent with the assumption in our original opinion in this case that the Judicial Conduct Commission established by section 13 of article VIII was intended to perform an exclusively judicial function. The voters, however, informed by this language, approved the amendment.

¶ 22 In *Society of Separationists*, we said that historical and textual evidence, policy, as well as plain language are the tools that we use in determining the purpose of constitutional provisions. The historical materials discussed above and the textual comparison of section 13 with the preexisting statutory provisions dealing with the Judicial Conduct Commission convince us that the function to be performed by the commission is not and has never been one that is exclusively within the province of the judicial branch. Rather, that function was intended by the Constitutional Revision Commission which drafted the article, the legislature which placed it before the people, and the voters who adopted it to be performed collaboratively by the several branches. Because the function performed by the commission is not the exclusive province of the judiciary, we answer the second question in our article V, section 1 analysis in the negative—the function exercised by the legislators sitting on the commission is not "appertaining to" the judicial branch.[7] Therefore, the prohibi-

---

7. Given that article VIII, section 13 contemplated that legislators would serve on the commis-

sion, article VI, section 6 appears not to be implicated by legislators serving on the Judicial

tion contained in the second clause of article V, section 1 has no application to sections 78–7–27(1)(a) and (b). That has two consequences. First, because there is no requirement that the constitution expressly direct or permit service by legislators on the commission, there is nothing to prevent the legislature, in the exercise of the authority given it by article VIII, section 13, from passing a statute placing legislators on the commission. Second, because the members of the commission do not perform exclusively judicial functions, the power to appoint them does not belong solely to the Governor and there need not be any constitutional provision expressly directing or permitting their appointment by someone other than the Governor.[8]

¶ 23 The only remaining ground for challenging legislative service on and appointment to the commission is the first clause of article V, section 1. That clause has not been specifically addressed by the parties in this case, but it is reasonably implicated in the issues briefed. The first clause of article V, section 1 does not contain the specific ban of the second clause. It simply states that the government is to be divided into three branches. Our cases have indicated that the first clause is only offended when there is an attempt by one branch to dominate another in that other's proper sphere of action. *See, e.g., Matheson I,* 641 P.2d at 678. The first clause disallows one branch from effectively controlling another even when the power in question is shared. *See id.*

¶ 24 On the facts of this case, there is no reason to conclude that the first clause is violated. First, in *Matheson I,* the legisla-

ture had no specific constitutional authorization for what it was attempting. *See id.* Therefore, we had to analyze its actions under the general rubric of separation of powers. Here, however, the legislators are performing functions that section 13 of article VIII intended them to perform, functions that are definitionally not within the exclusive sphere of the judiciary. Therefore, there is nothing in those functions standing alone that could give rise to a complaint that legislators are using these functions to dominate another branch, here the judicial. Second, even assuming for the purposes of argument only that in performing the functions given it by section 13, the Supreme Court is performing a judicial function, or even an exclusively judicial function, the legislators on the commission are not in a position to interfere with or dominate the exercise of that function. The Judicial Conduct Commission's relationship to the Supreme Court in matters of judicial discipline is preliminary and advisory, as it was under the preceding statutory regime. The constitution gives this court the power to review matters of law and fact, to take additional evidence if it desires to do so, and to reject in whole or part, or modify as it sees fit, the recommendations of the commission. As we said in *In re Worthen,* "this court, not the [Judicial Conduct] Commission, has ultimate responsibility for determining both whether conduct that warrants sanctions has been proven and what those sanctions should be." *In re Worthen,* 926 P.2d 853, 862 (Utah 1996); *see also Salt Lake City v. Ohms,* 881 P.2d 844, 850 (Utah 1994) (delineating power of Judicial Conduct Commission as "power to investigate com-

Conduct Commission contrary to what two of us have said. *See* Original op. ¶¶ 92–94 (Howe, C.J., concurring and Zimmerman, J., concurring). This is because the specific provision, article VIII, section 13, governs over the general one, article VI, section 6. *See State v. Lowder,* 889 P.2d 412, 414 (Utah 1994).

8. In *Rampton v. Barlow,* 23 Utah 2d 383, 464 P.2d 378, 379 (1970), we held that article VII, section 10 reserved to the Governor the power to appoint officers whose positions were created by the constitution or statute only when no other method was provided by law for filling those positions. *See id.* In our original opinion in this matter, however, we reasoned that because the members of the commission perform exclusively

judicial functions, the power to fill those positions is inherently an exclusively executive function and, as such, it cannot be given to a member of another branch by mere statute. That would violate the integrity of the executive branch. Therefore, article V, section 1 requires that the constitution expressly bestow that power on another. *See* Original op. ¶ 81. That line of reasoning hinged entirely upon the proposition that the power exercised by the commission is exclusively judicial. Since we now conclude that it is not, under *Rampton v. Barlow,* a statute is sufficient to give the President of the Senate and the Speaker of the House the power to make these appointments.

plaints and recommend sanctions"). In the present case, then, there is no basis for finding that the presence of legislators on the Judicial Conduct Commission could violate the first clause of article V, section 1.

¶ 25 The final issue is a request that we clarify the scope of our holding so that it does not inadvertently imperil the functioning of various boards and commissions within state government upon which members of two or more of the three branches may sit together. The anxieties expressed by the amici seem to stem from the fact that the original opinion spoke of the conduct commission as exercising judicial functions that could not be participated in by members of other branches, based on the mere fact that the commission was provided for in the judicial article of the constitution. This was found to be the case even though the Judicial Conduct Commission does not have more than a preliminary function when it comes to judicial discipline. The apparent conclusion of the amici was that this meant no matter how purely advisory its function, any board or commission that could be seen as an adjunct of any one branch of government could not have members from another branch.

¶ 26 The original opinion held that the Judicial Conduct Commission performed an inherently judicial function, one therefore exclusive to the judiciary. As we have noted above, this conclusion is incorrect for two reasons. First, the 1984 amendment made the commission the exerciser of a function which is not exclusively judicial. Second, and more important from the standpoint of the concerns of the amici, the commission does not in any event purport to perform a function that is inherently and exclusively judicial, such as entering judgment. The commission makes only nonbinding recommendations to this court. Analogously, we have indicated that there is no usurpation of an exclusive judicial function for a domestic relations commissioner, who lacks any constitutional status, to handle a proceeding right up to sending a proposed order to a judge. *See Salt Lake City v. Ohms*, 881 P.2d at 851 n. 17. Therefore, even if article VIII, section 13 did not exempt the Judicial Conduct Commission from the reach of the second clause

of article V, section 1, and even if this court were exercising an exclusively judicial function in entering orders of discipline against judges—a question not before us and which we do not decide—legislative participation on the commission would not impinge upon the Supreme Court's exclusively judicial function. *See id.* at 851. For this reason, a proper understanding of the analytical model used in our separation of powers cases indicates that unless a board, commission, or other body upon which a member of one branch sits purports to exercise a function "appertaining to" another branch, there need be no concern about that service running afoul of the second clause of article V, section 1. As discussed above, the term "appertaining to" has historically been interpreted as meaning more than just a power or function that is exercised by one branch. Rather, it must be one that is essential, core, or inherent in the very concept of one of the three branches of a constitutional government. Unless that standard is met, the function is not one barred to other branches, or to members of those branches.

¶ 27 Obviously, whether the separation of powers principle is violated in any particular situation beyond the one before us is not a question we address today. But this clarification should be enough to allay fears expressed by the amici, without our venturing unnecessarily into the realm of an advisory opinion.

¶ 28 In conclusion, we reject Judge Young's contentions that sections 78–7–27(1)(a) and (b) are unconstitutional and that the Judicial Conduct Commission is unlawfully composed. We recognize that as a result of our earlier decision in this matter, the Judicial Conduct Commission operated for a short period without its four legislator members. Its actions during that period are lawful and valid insofar as the Commission nevertheless acted with a quorum present.

¶ 29 Regarding the matter that brought this case before us, the recommendation of public discipline for Judge Young, we request the parties to reargue the question of the appropriateness of the recommended sanctions. We will set the matter for argument at the earliest convenience.

¶ 30   Associate Chief Justice DURHAM and Justice RUSSON concur in Justice ZIMMERMAN'S opinion.

HOWE, Chief Justice, concurring specially:

¶ 31   I concur and write to more specifically articulate why I am voting for a rehearing and to reverse our earlier decision.

¶ 32   In our prior opinion, we held that the Conduct Commission exercised "a type of judicial authority," and then, I believe, we erroneously concluded that legislators could not exercise such authority. In so holding, we were not true to our prior cases on the separation of powers as has been explained in the majority opinion written by Justice Zimmerman. In *Timpanogos Planning & Water Management Agency v. Central Utah Water Conservancy District,* 690 P.2d 562 (Utah 1984), we wrote that "the cases on separation of powers do not enunciate bright lines whereby each of the three governmental powers may be quickly and clearly identified." That fact makes our task more difficult. The best guide that we have was stated in *Taylor v. Lee,* 119 Utah 302, 226 P.2d 531 (1951), where we stated that it is only those powers which are so "inherently legislative, executive, or judicial in character that they must be exercised exclusively by their respective departments."

¶ 33   There are certain powers which are unquestionably judicial powers: sentencing those who violate the criminal laws; the construction and interpretation of a constitution; entering a money judgment against a person, just to name a few. I have found little or no authority that the power to discipline judges is a primary function of the judiciary, nor that it is inherently judicial in character. In not focusing on the primary functions of the judiciary in our former opinion, I believe that we erred. We were persuaded that if members of other branches of government were involved in judicial discipline, they might be able to embarrass members of the judiciary, thereby impairing judicial independence. While that argument has some merit, our

case law simply does not extend the separation of powers that far. I also believe that in our former opinion we failed to give proper weight to the fact that the Conduct Commission only makes recommendations to this court on discipline, and that it is this court, and not the Commission, that imposes the discipline.

¶ 34   As to the power of the President of the Senate and the Speaker of the House of Representatives to appoint legislators to serve on the Conduct Commission, we again erred in denying that power to them. Unlike the members of the State Board of Education which we held in *Rampton v. Barlow,* 23 Utah 2d 383, 464 P.2d 378 (1970), could not be appointed by legislative leaders because the Board was part of the executive department, the Conduct Commission, while having its roots in article VIII of the Constitution, does not exercise powers which are primarily or inherently judicial.

STEWART, Justice, dissenting:

¶ 35   On July 10, 1998, this Court unanimously held in *In re Young,* 961 P.2d 918 (Utah 1998),[1] that Utah Code Ann. § 78-7-27(1)(a) and (b) violated the separation of powers provision of the Utah Constitution, Article V, section 1. Those two subsections authorized the President of the Senate and the Speaker of the House to appoint members of the Legislature to the Judicial Conduct Commission. After *Young* was handed down, various legislators threatened to initiate retaliatory action against the judiciary by asserting even greater legislative control over discipline and retention of judges. Four members of the Court now embrace the exact opposite position from that which they took in the initial *Young* opinion. They now hold that it is constitutional for legislators to appoint members of, and to sit on, the Judicial Conduct Commission.

¶ 36   The response to the July 10 opinion was extraordinary. Some asserted that the Judicial Conduct Commission had in effect been put out of business and that the en-

---

1. The Court withdrew the July 10 opinion from official publication, pending the disposition of a petition for rehearing. The Court's July 10 opin-    ion is appended to this opinion and will be cited as "Original *op.*"

forcement of judicial discipline had been ended.

¶ 37 In addition, some asserted that many interbranch governmental commissions were now unlawfully constituted insofar as their members were appointed from various departments of the government. A careful reading of the July 10 opinion does not support their assertions. The frenzy of the moment was exacerbated by threats from the Legislature to take retaliatory measures against the judiciary.

¶ 38 In an effort to calm the waters, the Judicial Conduct Commission filed a petition for rehearing, asking that this Court declare that the sections it held unconstitutional, Utah Code Ann. § 78-7-27(1)(a) and (b), were severable and that the Commission could continue to operate. The July 10 opinion clearly declared only two subsections of section 78-7-27(1) unconstitutional, and it is patently clear that absolutely nothing in the opinion suggested that the Commission could not continue to sanction. On the basis of long-established case law, it is clear that the unconstitutional provisions are severable from the remainder of section 78-7-27 and that the remaining provisions can operate to give effect to the legislative intent. *See, e.g., Stewart v. Utah Pub. Serv. Comm'n*, 885 P.2d 759, 779 (Utah 1994).[2]

¶ 39 Judge Young and the Commission are the only parties to the dispute before this Court. The Commission has not asked for any modification of this Court's opinion, much less a withdrawal of it. Nor has the Commission asked for any other relief of any kind from this Court. In short, the Commission has full authority and has had since our opinion of July 10, 1998, to continue to pursue its extraordinarily important work in the area of judicial discipline. That work certainly can and should go forward with the same dedication and intensity as it has in the past.

¶ 40 Governor Michael Leavitt and Attorney General Jan Graham filed a joint amicus brief urging this Court to amend *Young* to declare that the provisions held unconstitutional in *Young* are severable from the remaining provisions, thus allowing the Commission to continue functioning. In addition, the Governor and the Attorney General requested that the Court amend *Young* to provide guidance to state lawmakers and others who have concerns regarding the constitutionality of other boards and commissions whose members are appointed from the various branches of government.

¶ 41 The Utah Judicial Council and the Administrative Office of the Courts also filed a joint amicus brief urging that the Court establish a standard that would clarify when judges may serve on boards formed by other branches of government and when judicial committee positions may be occupied by members of other government branches. More generally, these bodies ask the Court to devise a framework or process by which the three branches of government can evaluate the constitutionality of "dozens of existing mixed boards." That request must be denied because it asks for an advisory opinion.

¶ 42 The four legislators who served on the Commission when *Young* issued also filed an amicus brief and sought to intervene as parties. This Court denied that motion, holding that they are not proper parties. Despite that fact, and in patent disregard of fundamental rules of procedure generally and in violation of the Utah Rules of Appellate Procedure, they ask that this Court vacate its unanimous opinion in *Young* and issue an opinion to the exact opposite of what our July 10 opinion held. Although the legislators are nonparties to this case, and al-

---

**2.** In addition to legislative members appointed from the House and the Senate, subsection (1) of section 78-7-27 provides that the membership of the Commission shall be composed of three members from the Board of Commissioners of the Utah State Bar, two persons appointed by the Governor who are not members of the Bar, and one judge of a trial court of record "to be selected by the nonjudicial members of the Judicial Conduct Commission." Utah Code Ann. § 78-7-27(1)(e). The judge of a trial court of record (and an alternate judge) can be selected by the remaining members of the Commission so as to give effect to the legislative intent and allow the Judicial Conduct Commission to act with the six members necessary under § 78-7-27(6) to constitute a quorum. Under that provision, "[a]ny action of a majority of the quorum constitutes the action of the Commission."

though neither the Governor, the Attorney General, the Judicial Conduct Commission, nor the Judicial Council has so requested, the four legislators ask that we not only vacate the July 10 opinion but that we also issue a new opinion that "accurately reflects" a so-called "compromise" that led to the 1984 rewrite of Article VIII of the Utah Constitution. They urge the Court to consider the "historical" evidence that legislators had functioned as members of the Commission prior to 1984 and that some members of the Legislature thought they would continue to so function after the amendment. The legislators also refer to language in the voter's information pamphlet that explained the various provisions in the proposal submitted to the electorate that was later adopted as Article VIII of the Constitution. The legislators argue that such evidence reflected "the clear intent to preserve the ability of legislators to appoint and serve on the Judicial Conduct Commission." Incredibly, the majority of this Court grants the request of these non-parties and ignores the positions of the Conduct Commission, the Governor, the Attorney General, and the Judicial Council. The "new information" that is asserted is not properly before the Court but, more importantly, simply cannot legitimately override the plain, clear language of the Constitution.

¶ 43 The short answer to the legislators' argument is that Article V, section 1 makes explicit that no person charged with the exercise of a legislative power may exercise power that belongs to another one of the departments of government "except in the cases herein expressly directed or permitted," that is, in the Constitution itself.

¶ 44 Article V, section 1 of the Utah Constitution states:

The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; *and no person charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining*

*to either of the others, except in the cases herein expressly directed or permitted.*

(Emphasis added.)

¶ 45 It is beyond cavil that Article VIII, section 13 does not "expressly" direct or permit legislators to exercise a judicial power. This the majority concedes. However, the majority asserts that legislators sat on the Commission before the 1984 amendment, and relies on statements by Representative James Moss on the floor of the House and the voter information pamphlet to support its view that legislative appointment to and service on the Commission are not functions "appertaining to" the other branches, thus avoiding the Separation of Powers Clause entirely. Such statements cannot legitimately be used to override the plain language of the Constitution.

¶ 46 The central holding of the majority opinion is that the powers exercised by the Commission are not "judicial" in nature and therefore not subject to Article V, section 1. The argument is not only contrary to long-established authority but, more importantly, seriously subverts Article V, section 1 and the independence of judges that Article V, section 1 secures. Judicial discipline—whether by way of impeachment [3] or otherwise—is the exercise of a judicial power. The 1896 Utah Constitution explicitly recognized that the Senate, when acting in the most extreme kind of judicial discipline—impeachment—exercised judicial power. *See* Utah Const. art. VIII, § 1 (1896). *In re Handley's Estate* stated: "The senate, while sitting as a court of impeachment, has judicial authority, so far as necessary, to try such issues. Otherwise the constitution has not entrusted any part of the judicial power of the state to the legislature." 15 Utah 212, 219, 49 P. 829, 830–31 (1897). The principle function of the Commission, its sole purpose, is judicial discipline. By definition, the Commission therefore performs a function "appertaining to" the judicial branch under Article V, section 1. The majority's proposition

---

**3.** The impeachment powers granted the Legislature, including the power to impeach a judicial officer, are embodied in Article VI, sections 17–20 of the Utah Constitution. While found in the legislative article, these sections are an express constitutional grant of judicial authority to the Legislature and form part of the checks and balances between governmental departments found in the Utah Constitution.

that the Commission does not exercise a function that "appertains to" the judicial branch is simply wrong. As this Court stated in *Young:*

> The Judicial Conduct Commission plays a highly important, albeit not a determinative, role in the administration of judicial discipline by investigating and conducting confidential hearings regarding complaints against justices and judges. Consequently, the Commission exercises a type of judicial authority and operates within the judicial branch.

Original op. ¶ 84. We also pointed out in *Young* that other jurisdictions "have also held judicial conduct commissions with similar authority to be within the judicial branch." *Id.* ¶ 85 (citing *Whitehead v. Nevada Comm'n on Judicial Discipline,* 110 Nev. 874, 878 P.2d 913 (1994) (holding executive branch prosecution of disciplinary charges against judge before commission violated separation of powers clause in Nevada Constitution)).

¶ 47 The majority denigrates the important judicial function served by the Commission. The majority seeks to relegate the Commission to nothing more than a fact-finding "group" whose function approximates that of a gatekeeper to this Court, where the real adjudication occurs. The Court states, "The Judicial Conduct Commission's relationship to the Supreme Court in matters of judicial discipline is *preliminary and advisory,* as it was under the preceding statutory regime." Maj. op. ¶ 24 (emphasis added). That flatly misstates and mischaracterizes the role and function of the Commission. Justice Zimmerman, the author of *In re Worthen,* 926 P.2d 853 (Utah 1996), stated therein that the Commission is not merely a fact-finding "group" that submits suggestions to this Court but that the. Commission functions in a way analogous to that of a district court deciding attorney disciplinary matters. *See id.* at 863. *Worthen* stated: "The Constitution provides that upon 'complaint[ ] against any justice or judge' the Commission is assigned the responsibility of performing an investigation, considering the evidence at a hearing, and thereafter, entering an order of sanctions." *Id.* at 862 (quoting Utah

Const. art. VIII, § 13). In identifying an appropriate standard for reviewing Commission orders, Justice Zimmerman stated that the standard we adopt "should not make the Commission a mere factotum, lacking real power and without a significant role to play in the judicial discipline process." *Id.* at 862–63. We deemed it appropriate to review Commission determinations much as we do decisions relating to attorney discipline matters. Incorporating this standard into the context of reviewing Commission decisions, we stated:

> We will not. overturn the Commission's findings of fact unless they are arbitrary, capricious, or plainly in error, but we reserve the right to draw inferences from the basic facts which may differ from the Commission's inferences and grant no deference to the Commission's ultimate decision as to what constitutes an appropriate sanction.

*Id.* at 865.

¶ 48 Indeed, *Worthen* rejected the approach of some states that require the Court to engage in de novo review of both fact and law. *Worthen* acknowledged that some may argue that we should review, "de novo on the record," both legal and factual conclusions of the Commission, but expressly rejected such arguments. Our reason for doing so is instructive because it belies the majority's characterization of the Commission's role as merely preliminary and advisory.

> Although a standard of no deference on factual questions could be made to harmonize with the language of the constitutional provision [creating the Commission], such a reading would not be consistent with the structural relationship of the Commission to this court. First, *there is nothing in the constitution that suggests the Commission is to function as a mere evidence collector for this court.* Yet that would be precisely its function if we refused it any deference on questions of fact. The constitution and the legislation implementing its directives clearly contemplate that *the Commission will have a significant role to play* in gathering evidence of judicial misconduct, making determinations of fact, and recommending sanctions to

this court. By granting some measure of deference to the Commission's findings of fact, we will be honoring that role.

*Id.* at 864 (emphasis added). Indeed, we said that de novo review of the Commission's factual findings would "demean the role of the Commission in the judicial discipline process." *Id.* at 865.

> Long history has taught the judiciary that the forum which hears conflicting evidence has a superior capability to resolve factual questions, particularly where witness demeanor is concerned. There is no reason to ignore that teaching only when dealing with judicial discipline. Moreover, it can be argued that the political function of a judicial conduct commission—to lend neutral credibility to the handling of allegations of misconduct against judges while assuring that judges are subjected to effective and measured discipline, where necessary—requires that the Commission's actions be reviewed by a court with some deference.

*Id.* (citation omitted).

¶ 49 The majority opinion is devoid of any meaningful analysis of the purpose that Article V, section 1 was intended to further. The central purpose of Article V is the preservation of the independence and integrity of the three branches or departments of government. As we stated in *Young,* Utah's Separation of Powers Clause

> preserves the sanctity of the judiciary and helps to ensure that the rule of law, and not political partisanship or transient majoritarian preferences, shall govern in our courts.... Adherence to the impartial rule of law, so crucial to our system of government, can only prevail if the judiciary is able to apply the rule of law free from partisan influence.

Original op. ¶ 76. Absent judicial independence,

> the whole fundamental concept of a tripartite system of government with coequal and coordinate branches of government, as well as our deep-rooted tradition of limiting the powers of government by a written constitution, would be jeopardized, if not destroyed.

*Matheson v. Ferry,* 657 P.2d 240, 247 (Utah 1982) (Stewart, J., concurring) (*Matheson II*).

¶ 50 The separation of powers doctrine embodied in the United States Constitution also contemplates an independent judiciary. "In our country, the belief in the value of an independent federal judiciary is pervasive, even sacrosanct." Honorable J. Clifford Wallace, *Judicial Administration in a System of Independents: A Tribe with Only Chiefs,* 1978 B.Y.U. L.Rev. 39, 40 (1978). "[N]o feature of our public institutional life is likely more essential to preserving a government of laws than an honorable and independent judiciary." Peter M. Shane, *Who May Discipline or Remove Federal Judges? A Constitutional Analysis* in *I Research Papers of the National Commission on Judicial Discipline & Removal* 1, 2 (1993) [hereinafter Shane, *Judicial Discipline: A Constitutional Analysis*].

¶ 51 Such sentiments most often relate to *decisional* independence, the "sine qua non of judicial independence." Gordon Bermant & Russell R. Wheeler, *Federal Judicial Independence Symposium: Federal Judges and the Judicial Branch: Their Independence and Accountability,* 46 Mercer L.Rev. 835, 838 (1995). However, judicial independence, as protected by the doctrine of separation of powers, also requires "procedural and administrative independence" which "exist to serve decisional independence." *Id.*

¶ 52 Administrative independence refers to the power of the judiciary to review the conduct of its own members and impose disciplinary measures, where necessary, without the interference of the political branches. "Except perhaps for concerns surrounding the processes of judicial nomination and confirmation, *no issues pertain more directly to the quality of judicial integrity and independence* than the issues of judicial tenure, compensation, *discipline* and removal." Shane, *Judicial Discipline: A Constitutional Analysis,* at 2 (emphasis added).

¶ 53 The doctrine of separation of powers provides a *"decisive argument for the flat impermissibility of political mechanisms for judicial discipline* other than impeachment." *Id.* at 10 (emphasis added).

¶ 54 This Court has embraced that concept. In *Salt Lake City v. Ohms*, Justices Zimmerman and Durham stated, "Any attempt to place the exercise of the judicial power outside the control of the judiciary threatens 'the fundamental integrity of the judicial branch.'" 881 P.2d 844, 867 (Utah 1994) (quoting *In re Criminal Investigation*, 754 P.2d 633, 642 (Utah 1988)) (Zimmerman, J., and Durham, J., dissenting). Thus, critical to a Separation of Powers Clause inquiry is whether the statute at issue "compromises the essential independence of the judiciary." *Id.* at 864 (Zimmerman, J., and Durham, J., dissenting) (internal quote omitted).

¶ 55 With these principles, and a more accurate description of the Commission's relationship to this Court, in mind, I turn to the question of whether the participation of legislators on the Commission violates the doctrine of separation of powers under Article V, section 1. Utah Code Ann. § 78-2-27 provides for legislative appointment to, and participation on, the Commission. If legislative involvement in the Commission could threaten the independence of the judiciary, that involvement constitutes a violation of the Separation of Powers Clause, because it compromises a fundamental interest protected by that provision. By definition, legislative members would be engaged in functions "appertaining to" the exclusive province of the judicial branch, and the statute authorizing the legislators to do so is unconstitutional.

¶ 56 The President of the Senate and the Speaker of the House appoint four of the ten members making up the Commission. Without doubt, the exercise of Commission disciplinary authority may be used against a judge whose views differ from those held by legislative members of the Commission. Likewise, legislative power to appoint four members of the Commission and legislative membership on the Commission may also create the appearance of undue political influence, whether or not that influence ever materializes. This potential alone may diminish independence of the judiciary in the eyes of a public that is expected to respect judicial opinions with which it may seriously disagree. Judicial integrity could be compromised if it becomes increasingly believed that judicial rulings are influenced by political forces.

¶ 57 In *Young* we stated, "Any attempt by the Legislature, therefore, to make judicial discipline subject to the influence of legislators could threaten the fundamental integrity of the judicial branch." Original op. ¶ 86 (internal quotes omitted). We also pointed out that no branch of government should be allowed "even to embarrass another branch," recognizing the deleterious impact of judicial decisions influenced by politics and the resulting diminished public esteem for the judiciary. *Id.* ¶ 87 (citing *Matheson v. Ferry*, 641 P.2d 674, 681 (Utah 1982) (*Matheson I*) (Howe, J., concurring); *State v. Shumaker*, 200 Ind. 716, 164 N.E. 408, 409 (1928)).

> The participation of members of the legislative branch in the highly sensitive area of judicial discipline has the distinct possibility of embarrassing the judicial branch by interjecting the potential of partisan influence in the disciplinary process, with the potential effect of altering the thinking and actions of judges in cases over which they preside. Thus, even though the Commission's recommended sanctions are not self-executing, a high barrier must insulate commission proceedings from any kind of partisan political influence.

*Id.*

¶ 58 In fact, the reasonable concern that the Commission may be used to encroach "upon the exercise of legitimate discretion by members of the judicial branch" led this Court in *Worthen* to review less deferentially the Commission's factual findings in comparison with those of a trial court or an agency.

> "We must therefore depart from our normal rule of deference to factfinding by trial courts and administrative agencies. We have a nondelegable responsibility, upon an appeal, to undertake a scrupulous and searching examination of the record to ascertain whether there was substantial evidence to support the council's factual findings."

*Worthen*, 926 P.2d at 864 (quoting *In re Zoarski*, 227 Conn. 784, 632 A.2d 1114, 1118 (1993)) (internal quote omitted). Other jurisdictions have expressed concern for the need

to provide "a check on an errant commission." *Id.* at 865. The concerns expressed in *Worthen* demonstrate that fears that judicial conduct commissions may be used to advance political ends to the detriment of judicial independence are not unfounded.

¶ 59 The majority is simply incorrect in the arguments it advances. It relies upon extrinsic evidence to construe Article VIII, section 13 of the Constitution and comes to the incorrect conclusion that legislators and voters intended legislative appointment to, and participation on, the Commission. Had they so intended, legislators and voters would have so stated, as Article V, section 1 requires. The separation of powers provision only permits exceptions that are "*expressly directed or permitted*" by other provisions of the Constitution. Article VIII, section 13 does not provide any such express exception. The legislators can argue compromise at the Legislature in the debate over the 1984 judicial article revision, the statutory history of the judicial qualifications commission prior to 1984 when it was an almost totally nonfunctioning entity,[4] and information in voter pamphlets that proves nothing more than what the author of the pamphlet may have thought, but the beginning and the end of the argument is that Article VIII, section 13 does not expressly provide for legislative appointment and service on the Commission. Moreover, the majority's effort to avoid these fundamental constitutional precepts by arguing that the Commission does not exercise judicial power is astonishing. That proposition is contrary to the Constitution, case law, and common sense.

¶ 60 This "new extrinsic evidence" cannot be used to contradict the plain language in both Article V, section 1, and Article VIII, section 13. " 'The rule which should be applied is that laws, and especially foundational laws such as our Constitution, should be interpreted and applied according to the plain import of their language as it would be understood by persons of ordinary intelligence and experience.' " *Ohms*, 881 P.2d at 850 n. 14 (quoting *State v. Phillips*, 540 P.2d 936, 938 (Utah 1975), *disavowed on other grounds, State v. Taylor*, 664 P.2d 439, 448 n. 4 (Utah 1983)) (citing *University of Utah v. Board of Examiners*, 4 Utah 2d 408, 295 P.2d 348, 361 (1956) (holding that if constitutional provision is clear "then extraneous or contemporaneous construction may not be resorted to"); *Society of Separationists, Inc. v. Whitehead*, 870 P.2d 916, 944 (Utah 1993) (Stewart, J., dissenting) (stating that the Court's "sworn duty [is] to uphold the language of the constitution," and it "shrinks from its duty" when it "refuses ... to enforce the plain and unambiguous meaning" of the constitution); *Brinkerhoff v. Forsyth*, 779 P.2d 685, 686 (Utah 1989)).

¶ 61 According to *Ohms*, the reason for the rule prohibiting extraneous or contemporaneous construction of facially plain and unambiguous constitutional provisions is that the rule "prevents judges from 'finding' an ambiguity in even the most plain language of a constitutional or statutory provision as an excuse to search the legislative history in an attempt to justify an interpretation they prefer." *Ohms*, 881 P.2d at 850 n. 14.

¶ 62 Just two years ago, in *Worthen*, we stated:

> Here, as in other cases, "when faced with a question of statutory [or constitutional] construction, we look first to the plain language of the statute [or constitution]." Under our rules of statutory construction, *we need not look beyond the plain language of this provision unless we find some ambiguity in it.... If we find the provision ambiguous, however, we then seek guidance from the legislative history and relevant policy considerations ....*
>
> ....

---

4. As this Court noted in *Worthen*, the Judicial Conduct Commission, prior to 1985, was basically a nonfunctional entity. "Although the Commission has been in existence in one form or another for some twenty-three years, it has not been particularly visible. Its level of appropriations was initially very low, and as a consequence, it had to make do with a one-person, part-time staff charged with all administrative functions." 926 P.2d at 858. The Commission initially received only a $3,500 appropriation. In 1985, $12,000 was appropriated. Thereafter the Commission's annual appropriation ranged from $12,000 to $32,000 until July 1995. *See id.* at 858 n. 2.

Although our rules of constitutional construction are not always identical to our rules of statutory construction, our case law confirms that the starting place for analysis of a constitutional provision is the language of the provision itself.

*Worthen,* 926 P.2d at 866 (internal quotes and citations omitted) (alteration in original) (emphasis added). In addition, various of our sister jurisdictions have stated that in interpreting a constitutional provision, resort to extrinsic evidence is prohibited unless the constitutional language is ambiguous. *See McElhaney Cattle Co. v. Smith,* 132 Ariz. 286, 645 P.2d 801, 805 (1982); *In re Opinion of Justices,* 575 A.2d 1186, 1189 (Del.1990); *Marker v. State,* 450 A.2d 397, 399 (Del. 1982); *Florida League of Cities v. Smith,* 607 So.2d 397, 400 (Fla.1992); *Evans v. Andrus,* 124 Idaho 6, 855 P.2d 467, 471 (1993); *Louisiana Assoc. Gen. Cont., Inc. v. State,* 669 So.2d 1185, 1196 (La.1996); *Rice v. Connolly,* 488 N.W.2d 241, 247 (Minn.1992); *Scott v. Commonwealth,* 247 Va. 379, 443 S.E.2d 138, 141 (1994); *Washington Economic Dev. Fin. Auth. v. Grimm,* 119 Wash.2d 738, 837 P.2d 606, 612 (1992).

¶ 63 The plain language of Article V, section 1 states that, except where "expressly directed or permitted," no person in one department of Utah government can "exercise any functions appertaining to either of the others." Article VIII, section 13 does not expressly direct or permit legislators to exercise judicial functions. The use of extrinsic evidence to avoid this plain language is improper.

¶ 64 In sum, the discipline of judges is a function that appertains to the judicial branch. Absent an express exception to the prohibitions of Article V, section 1 of the Utah Constitution, which has the effect of precluding legislative involvement in the Commission to the extent allowed under section 78–7–27, subsection 1(a) and 1(b) are unconstitutional. The majority and I both agree that Article VIII, section 13 contains no such express exception. Extrinsic evidence proffered by the four legislators formerly serving on the Commission cannot now be used to circumvent the plain language of the Separation of Powers Clause.

## APPENDIX

### July 10, 1998

STEWART, Justice:

¶ 65 The Judicial Conduct Commission proposed that a public reprimand be issued against Judge David S. Young for ex parte communications with an attorney for a party in a case pending before Judge Young. Judge Young petitioned for review of the Commission's findings and recommendation, asserting that the Commission's findings were in error and that the Commission as constituted under Utah Code Ann. § 78–7–27(1) violates the Separation of Powers provision of the Utah Constitution. We hold that the Commission as currently constituted violates Article V, section 1 of the Constitution.

## I.  BACKGROUND

¶ 66  *Gannon v. Park City Board of Education,* Case No. 940300027 CV., was filed by the parent of a student who was expelled from school for possession of a gun on school grounds, seeking reinstatement of the student in school. Judge Young was assigned the case during two different time periods. Before presiding over the case the second time, Judge Young had an ex parte communication with the attorney for the school district and allegedly threatened to award attorney fees to the plaintiffs and against the district if the district attempted to undertake further punitive action against the student. The attorney fee issue was settled by the parties after Judge Young was reassigned the case. The school district alleged, however, that Judge Young had coerced the settlement through his threat of awarding attorney fees against the district. The district superintendent filed an official complaint with the Judicial Conduct Commission, accusing Judge Young of "direct extortion ... to secure an agreement from the [Park City] Board [of Education]."

¶ 67 The Commission scheduled a formal hearing. Judge Young moved to disqualify from participating in the panel all members of the Commission appointed by the President of the Senate and the Speaker of the

House. The Commission denied the motion, and a formal hearing was conducted by a panel of six members of the Commission. Three of the six panel members were members of the Utah State Legislature. The Commission found that Judge Young had engaged in conduct prejudicial to the administration of justice and recommended a public reprimand as the appropriate discipline. Judge Young filed objections to the Commission's findings. The Commission denied these objections and certified the record to this Court.

¶ 68 Judge Young attacks numerous findings of fact by the Commission. In addition, he contends that the composition of the Judicial Conduct Commission violates principles of separation of powers established by Article V, section 1 of the Utah Constitution.

¶ 69 Article VIII, section 13 of the Utah Constitution requires this Court to review all proceedings conducted by the Judicial Conduct Commission and to approve any proposed sanction before a sanction may be imposed against a judge. *See In re Worthen*, 926 P.2d 853, 862–63 (Utah 1996); *see also* Utah Code Ann. § 78–7–30(5). The issue of whether the Judicial Conduct Commission is lawfully constituted under Article V, section 1 and Article VIII, section 13 raises an issue of law which requires no deference by this Court to the Commission's rulings. *See In re Worthen*, 926 P.2d at 862–63.

¶ 70 The Legislature established the Judicial Conduct Commission pursuant to the terms of the Judicial Article of the Utah Constitution, Article VIII, section 13.[1] This provision authorizes the Commission to investigate and conduct confidential hearings concerning complaints against judges. The Commission may recommend to this Court sanctions such as a reprimand, censure, suspension, removal, or compulsory retirement of judges found to have engaged in improper conduct.[2]

¶ 71 Section 13 also provides that the Legislature shall "provide for the composition and procedures of the Judicial Conduct Commission." Utah Code Ann. § 78–7–27(1) provides:

> The membership of the Judicial Conduct Commission established by Article VIII, Section 13 of the Utah Constitution consists of:
>
> (a) two members of the House of Representatives to be appointed by the speaker of the House of Representatives for a two-year term, not more than one of whom may be of the same political party as the speaker;
>
> (b) two members of the Senate to be appointed by the president of the Senate for a two-year term, not more than one of

---

1. Article VIII, section 13 of the Utah Constitution provides:

   A Judicial Conduct Commission is established which shall investigate and conduct confidential hearings regarding complaints against any justice or judge. Following its investigations and hearings, the Judicial Conduct Commission may order the reprimand, censure, suspension, removal, or involuntary retirement of any justice or judge for the following:
   (1) action which constitutes willful misconduct in office;
   (2) final conviction of a crime punishable as a felony under state or federal law;
   (3) willful and persistent failure to perform judicial duties;
   (4) disability that seriously interferes with the performance of judicial duties; or
   (5) conduct prejudicial to the administration of justice which brings a judicial office into disrepute.
   Prior to the implementation of any commission order, the Supreme Court shall review the commission's proceedings as to both law and fact. The court may also permit the introduction of additional evidence. After its review, the Supreme Court shall, as it finds just and proper, issue its order implementing, rejecting, or modifying the commission's order. The Legislature by statute shall provide for the composition and procedures of the Judicial Conduct Commission.
   The judicial article was rewritten in 1984. 1984 Utah Laws S.J.R. 1. Prior to the revision, Article VIII did not provide for a judicial conduct commission. Rather, the former section 11 of Article VIII provided that judges could "be removed from office by the concurrent vote of both houses of the Legislature, each voting separately." Utah Const. art. VIII, § 11 (1971).

2. "[W]hile the constitution speaks of the Commission's entering an 'order,' that term is a misnomer, ... because the Commission's order has no effect whatsoever unless it is first reviewed by this court *and* this court determines to enforce it." *In re Worthen*, 926 P.2d at 862.

whom may be of the same political party as the president;

(c) three members from the board of commissioners of the Utah State Bar who shall be appointed by the board of commissioners of the Utah State Bar for a four-year term;

(d) two persons not members of the Utah State Bar, who shall be appointed by the governor, with the advice and consent of the Senate, for four-year terms, not more than one of which may be of the same political party as the governor; and

(e) one judge of a trial court of record, to be selected by the Judicial Conduct Commission for a four-year term.

¶ 72 Judge Young contends that subsections (a) and (b) of section 78-7-27(1) violate Article V, section 1 of the Constitution. He submits two grounds for this challenge. He argues that (1) Article V, section 1 prohibits the Legislature from appointing members of the Judicial Conduct Commission and (2) Article V, section 1 bars individual legislators from sitting as members of the Commission. We address each ground in turn.

## II. ARTICLE V, SECTION 1 AND THE JUDICIAL CONDUCT COMMISSION

### A. Constitutionality of the Power of the Speaker of the House and the President of the Senate to Appoint Members of the Judicial Conduct Commission

¶ 73 Article V, section 1 provides:

The powers of the government of the State of Utah shall be divided into three distinct departments, the Legislative, the Executive, and the Judicial; and no person

charged with the exercise of powers properly belonging to one of these departments, shall exercise any functions appertaining to either of the others, except in cases herein expressly directed or permitted.

¶ 74 The doctrine of separation of powers has been viewed historically as an essential principle in the protection of individual rights and liberties and in the prevention of the abuse of governmental power. "The framers of [Utah's] Constitution considered the principle embodied in Article V, section 1 to be of such importance that they wrote that provision to prevent its erosion by implication, strained constructions, or any means which would have the effect of enfeebling that great, overarching principle of constitutional government." *Matheson v. Ferry*, 641 P.2d 674, 689-90 (Utah 1982) (Stewart, J., concurring and dissenting) (*Matheson I*).[3]

¶ 75 Unlike the federal Constitution and the constitutions of many states, the Utah Constitution includes a written separation of powers provision, and that provision has a degree of specificity that is greater than is found in most state constitutions that have a separation of powers provision.[4] Separation of powers in the federal system, for example, is mandated merely by implication from the general structure of the United States Constitution. As a result, the United States Supreme Court can be more flexible and less specific in establishing the federal doctrine's outer boundaries. *See* Lawrence H. Tribe, *American Constitutional Law*, 18, 19 (2d ed.1987) (noting greater latitude in current judicial interpretations of the doctrine since the late nineteenth century). By contrast, interpretations of the Utah doctrine by this Court must conform to the express language

3. *Matheson I* held that a statute providing for the Legislature's participation in nominating candidates for judicial office and requiring Senate approval of the Governor's appointment of the candidate selected amounted to effective control by the Legislature and was therefore offensive to Article V, section 1. This case was followed by *Matheson v. Ferry*, 657 P.2d 240 (Utah 1982) (per curiam) (*Matheson II*), which held that senatorial confirmation of gubernatorial judicial appointments, in addition to judicial retention elections, violated the Utah Constitution. *Matheson II* preceded the 1984 revision to the judicial article of

the Constitution. Article VIII, section 8 now expressly permits the Senate to confirm judges appointed to courts of record by the Governor.

4. Alaska, Delaware, Georgia, Hawaii, Kansas, Maryland, New York, North Carolina, North Dakota, Ohio, Pennsylvania, South Carolina, Washington, and Wisconsin do not expressly provide in their constitutions for a separation of powers among the three branches of government. *See Timpanogos Planning & Water Mgt. Agency v. Central Utah Water Conservancy Dist.*, 690 P.2d 562, 565 n. 2 (Utah 1984).

employed by the Constitution in Article V, section 1 in delineating the principles that specify how the doctrine of separation of powers should be applied.

¶ 76   Article V, section 1 goes far beyond simply proscribing the exercise of the power of one branch by another.[5]   The Utah provision also prohibits officials in one branch from exercising powers properly belonging to another branch.   Moreover, by requiring the separation of powers among the branches of government, except as otherwise provided in the Constitution itself, Article V, section 1 preserves the sanctity of the judiciary and helps to ensure that the rule of law, and not political partisanship or transient majoritarian preferences, shall govern in our courts. The legislative and executive branches, both of which are staffed through popular elections, are naturally attuned to the volatile opinions of voters, evolving moral standards, and shifting economic forces.   Adherence to the impartial rule of law, so crucial to our system of government, can prevail only if the judiciary is able to apply the rule of law free from partisan influence.

¶ 77   "[A] direct or indirect influence of either of the other branches over the judiciary through the power of appointment, by itself or in conjunction with other powers, is coercive and undermines the independent functioning of the judiciary."   *Matheson I,* 641 P.2d at 681 (Howe, J., concurring). Without judicial independence,

> the whole fundamental concept of a tripartite system of government with coequal and coordinate branches of government, as well as our deep-rooted tradition of limiting the powers of government by a written constitution, would be jeopardized, if not destroyed.

*Matheson II,* 657 P.2d at 247 (Stewart, J., concurring).   Other provisions of the Consti-

tution combine with and give specific effect to the doctrine underlying Article V to assure that the exercise of governmental power shall be based on the rule of law and not caprice.   *See* Utah Const. art.   I, § 7 ("No person shall be deprived of life, liberty or property, without due process of law.");   *id.* § 11 (guaranteeing that "every person, for an injury done him in his person, property or reputation, shall have remedy by due course of law, which shall be administered without denial or unnecessary delay").

¶ 78   Article V, section 1 prohibits the officials of one branch of government from exercising those functions of government that properly belong to another branch.   *See Timpanogos Planning,* 690 P.2d at 567.   In addition, one branch may not delegate its functions or powers to another branch.   *See Salt Lake City v. Ohms,* 881 P.2d 844, 848 (Utah 1994) (enumerating cases in which functions or powers were held to be nondelegable).   The essential function of the legislative branch of government, as a general proposition, "is to enact laws of general applicability, to provide normative standards of conduct for society and to provide for the organization and operation of the government."   *Matheson I,* 641 P.2d at 686 (Stewart, J., concurring and dissenting).   More precisely, the Legislature "possesses all lawmaking power not denied it by the Utah or the United States Constitutions, [but] it does not possess all the powers of government." *Id.* (internal citations omitted); *see also* 16A Am.Jur.2d *Constitutional Law* § 262 (1998).

¶ 79   Article VII of the Constitution vests in the executive branch the general power to appoint officers whose positions are established under the Constitution.   *See Rampton v. Barlow,* 23 Utah 2d 383, 464 P.2d 378, 381 (1970); *see also Matheson I,* 641 P.2d at 678 (stating that the separation of powers provisions of Article V, section 1 protects the executive's appointment power).[6]   In *Ramp-*

---

5.   "[T]he doctrine of separation of powers is the control gate harnessing the reservoir of powers of a government which functions at the will of the people."   *Timpanogos Planning,* 690 P.2d at 565.

6.   The executive branch's appointment power is not exclusive, however.   Each branch of government possesses the inherent power to appoint its

own "agents, clerks, and ministers engaged in the work pertaining to such branch of government."   *Rampton,* 464 P.2d at 383.   "[F]or," as stated in *Rampton,* "to allow the executive to appoint the officers necessary to the carrying out of the functions of an independent branch or division of government would prevent that division from being independent."   *Id.*

*ton,* the Court stated that the issue to be decided was, "Can the Legislature reserve unto itself or confer upon its presiding officers, the power of appointment?" 464 P.2d at 380. That is also the precise issue in the instant case. *Rampton* held that a statute that authorized both the President of the Senate and the Speaker of the House to appoint three members of the State Board of Higher Education violated Article V, section 1. *Id.* at 383. In *Rampton,* this Court quoted *Opinion of the Justices,* 302 Mass. 605, 19 N.E.2d 807 (1939):

> We are of the opinion, however, that the power of appointing such members cannot be conferred by law upon the President of the Senate and the Speaker of the House of Representatives, whether or not such members are required to be chosen from among the members of the Senate and of the House. *"The power to appoint and the power to remove officers are in their nature executive powers."*

(Emphasis added.)

¶ 80 The principle on which *Rampton* was based governs here. Subsections (a) and (b) of Utah Code Ann. § 78–7–27(1) permit both the Speaker of the House of Representatives and the President of the Senate to appoint two members of the Judicial Conduct Commission. By vesting in these legislative officers the power to appoint officials exercising judicial power, the Legislature authorized a breach of the principle that one branch of government may not exercise the power of another branch absent a specific constitutional provision authorizing the exercise of such power.

¶ 81 The Commission argues that the language in Article VIII, section 13 of the Constitution, which provides that "[t]he Legislature by statute shall provide for the composition and procedures of the Judicial Conduct Commission," specifically authorizes the Legislature to make appointments to the Commission. This Court has previously rejected that argument. *See Matheson II,* 657 P.2d at 245 (Stewart, J., stating majority view in "concurring" opinion); *Rampton,* 464 P.2d at 380; *see also Matheson I,* 641 P.2d at 680–81 (Howe, J., concurring). Indeed, this

Court has specifically held that even when the Legislature is given the power by the Constitution "to provide by law" for the appointment of officials, that merely means that the Legislature has the power to provide for how appointments should be made, but not that the Legislature itself may make such appointments. *Matheson II,* 657 P.2d at 245 (Stewart, J., concurring). The power "to provide by law, for the appointment of officials does not include the power to make appointments to positions in the executive and judicial departments." *Id.* Because Article VIII, section 13 does not "expressly direct[ ] or provide[ ]" for the Legislature or legislative officers to exercise the power of appointment to the Judicial Conduct Commission, that language of Article VIII, section 13 does not fall within the exception to Article V, section 1 that allows one government branch to exercise the powers of another. Consistent with what this Court held in *Rampton,* the Legislature may not "usurp any of the functions confided by the constitution to [another] department, such as the power to make appointments to office." *Rampton,* 464 P.2d at 380 (quotations omitted); *see also Matheson I,* 641 P.2d 674 (Utah 1982).

*B.   Competence of Legislators to Sit as Members of the Judicial Conduct Commission*

¶ 82 Under Utah Code Ann. § 78–7–27(1)(a) and (b), two members of the Judicial Conduct Commission are appointed from the House of Representatives and two members are appointed from the Senate. Judge Young argues that the Commission performs a judicial function and that § 78–7–27(1)(a) and (b), in providing that legislators may sit as members of the Commission, allows legislators to exercise both legislative and judicial functions contrary to the prohibition of Article V, section 1. We agree.

¶ 83 Article V, section 1 precludes legislators from serving as members of the Commission. Article V, section 1 provides that "no *person* charged with the exercise of powers properly belonging to one of these departments, shall exercise *any* functions appertaining to either of the others." (Em-

phasis added.) The language of this provision is plain and must be interpreted "as it would be understood by persons of ordinary intelligence and experience." *State v. Phillips*, 540 P.2d 936, 938 (Utah 1975).

¶ 84 The Judicial Conduct Commission plays a highly important, albeit not a determinative, role in the administration of judicial discipline by investigating and conducting confidential hearings regarding complaints against justices and judges. Consequently, the Commission exercises a type of judicial authority and operates within the judicial branch of government. *See* 16A Am.Jur.2d *Constitutional Law* § 260 (1998). Necessarily, the judicial branch has the power " 'necessary to protect [its] fundamental integrity' " and that power may not be delegated, except to judicial officers. *Ohms*, 881 P.2d at 849 (quoting *In re Criminal Investigation*, 754 P.2d 633, 642 (Utah 1988)).

¶ 85 Indeed, it is the judicial article itself, Article VIII, section 13, that establishes the Judicial Conduct Commission and specifically recognizes the judicial nature of the powers the Commission is authorized to exercise by mandating that this Court review all Commission findings pertaining to recommended discipline of judges and by requiring that actual orders of discipline be entered by the Court, not the Commission. *See* Utah Const. art. VIII, § 13; *In re Worthen*, 926 P.2d at 863. Other jurisdictions have also held judicial conduct commissions with similar authority to be within the judicial branch. *See Whitehead v. Nevada Comm. on Jud. Discipline*, 110 Nev. 874, 878 P.2d 913 (1994) (holding that executive branch prosecution of disciplinary charges against a judge violated

the separation of powers provision in the Nevada Constitution, a provision identical to Article V, section 1 of the Utah Constitution).[7]

¶ 86 Any attempt by the Legislature, therefore, to make judicial discipline subject to the influence of legislators could threaten " 'the fundamental integrity of the judicial branch.' " *Ohms*, 881 P.2d at 867 (Durham, J., and Zimmerman, J., dissenting) (quoting *In re Criminal Investigation*, 754 P.2d 633, 642 (Utah 1988)); *see id.* at 850; *see also Matheson I*, 641 P.2d at 681 (Howe, J., concurring) ("[A] direct or indirect influence of either of the other branches over the judiciary … is coercive and undermines the independent functioning of the ·judiciary."); 16A Am.Jur.2d *Constitutional Law* § 260 (1998); ABA Standards Relating to Judicial Discipline and Disability Retirement, Standard 2.1 (1978).

¶ 87 Moreover, no branch of government should be able to control or even to embarrass another branch. *See Matheson I*, 641 P.2d at 681 (Howe, J., concurring); *State v. Shumaker*, 200 Ind. 716, 164 N.E. 408, 409, 63 A.L.R. 218, 221 (1928). Of course any disciplinary sanction recommended against a judge will undoubtedly embarrass that judge. But that is not the point of the proposition that one branch of government should not be able to embarrass another branch. What is to be strictly protected from embarrassment in this case is the integrity of judicial discipline from any politically partisan influence, indeed, even the appearance of such an influence. The participation of members of the legislative branch in the highly sensitive area of judicial discipline has the distinct possibility of embarrassing the judicial branch by

---

7. In support of its position, the Commission cites *In re Commission on Judicial Tenure & Discipline*, 670 A.2d 1232 (R.I.1996). Some members of the Rhode Island Commission on Judicial Tenure and Discipline also served as members of the Rhode Island Legislature. The Rhode Island Supreme Court was evenly divided on the issue of whether the composition of the Commission violated the Rhode Island constitutional separation of powers provision. Given the equal division of the court on that critical issue, the court decided the case solely on the basis that the statute providing for the composition of the Commission was presumed to be constitutional. Therefore,

this case does not support the Judicial Conduct Commission's position in the instant case. Indeed, given the language of Article V, section 1 of the Utah Constitution that no person charged with exercising the powers of one department of government "shall exercise any functions appertaining to either of the other" departments, which does not appear in the Rhode Island constitutional separation of powers provision, there can be little doubt that the Rhode Island Supreme Court would have held that the Rhode Island Commission was illegally constituted had the Rhode Island Constitution contained language similar to the Utah provision.

interjecting the potential of partisan influence in the disciplinary process, with the potential effect of altering the thinking and actions of judges in cases over which they preside. Thus, even though the Commission's recommended sanctions are not self-executing, a high barrier must insulate commission proceedings from any kind of partisan political influence. Having made this point, we emphasize, however, that our reasoning rests solely on general policy considerations and not on the conduct of legislators who have heretofore sat on the Commission. It is constitutional policy with which we are concerned here, not personalities.

¶ 88 Finally, we note that one of the great constitutional checks and balances is the power of the Legislature to impeach judges and executive officials. *See* Utah Const. art. VI, §§ 17–19. However, the existence of the impeachment process does not in any way lessen the need for strict adherence to the dictates of Article V, section 1 as that provision applies to legislative participation in the composition and administration of the Judicial Conduct Commission.

## II. .

¶ 89 We conclude that § 78–7–27(1)(a) and (b) violates Article V, section 1 of the Utah Constitution. Because the composition of the Commission was unconstitutional, the findings, conclusions, and order of the Commission are null and void.

¶ 90 Associate Chief Justice DURHAM and Justice RUSSON concur in Justice STEWART'S opinion.

HOWE, Chief Justice, concurring:

¶ 91 I concur and write only to state that in my opinion membership of legislators on the Judicial Conduct Commission also violates article VI, section 6 of the Constitution of Utah, which provides:

No person holding any public office of profit or trust under authority of the United States, or of this State, shall be a member of the Legislature: Provided, That appointments in the State Militia, and the offices of notary public, justice of the peace, United States commissioner, and postmaster of the fourth class, shall not, within the meaning of this section, be considered offices of profit or trust.

¶ 92 This section emphasizes that a legislative office is with a few exceptions not compatible with any other state office and underscores the intent of the constitution's framers that legislators should perform only legislative duties. By accepting appointment to the Judicial Conduct Commission, a legislator serves in a second office. While article VI, section 10 makes each house, and not the courts, the judge of the qualifications of its members, *State v. Evans,* 735 P.2d 29 (Utah 1987), legislators should not be exposed to the risk of forfeiting their membership in the legislature by assuming a second office.

ZIMMERMAN, Justice, concurring:

¶ 93 I agree with the basic proposition of the majority's opinion that the appointment of legislators to the Commission by the President of the Senate and Speaker of the House and service by legislators on the Commission violate article V, section 1 and article VII, section 10 of the Utah Constitution. I also agree with Chief Justice Howe's statement that service by legislators on the conduct commission implicates article VI, section 6 of the Utah Constitution.

¶ 94 I cannot agree with the majority opinion, however, because I cannot agree with some of its rhetoric regarding the nature of the legislative and judicial branches. I think it important to note that I find nothing in the record to suggest that service by legislators on the conduct commission has in any way affected the proceedings against Judge Young. However, the constitution prohibits establishment of structures that are inconsistent with Utah's separation of powers doctrine, not merely actions by individuals which constitute evils at which the doctrine is directed.

¶ 95 I am sure that the legislature can and will remedy the defects of the Judicial

Conduct Commission as presently constituted so it can continue to fulfill its important role in helping to assure the public that judges are subject to appropriate, nonpartisan oversight. *See In re Worthen,* 926 P.2d 853 (Utah 1996).