2004 UT 7

**In re Inquiry Concerning Judge Joseph W. ANDERSON.**

No. 20030345.

Supreme Court of Utah.

Jan. 23, 2004.

Colin R. Winchester, Salt Lake City, for the Judicial Conduct Commission.

Wayne G. Petty, Salt Lake City, for Judge Anderson.

M. Gay Taylor, Salt Lake City, for amicus Utah State Legislature.

Annina M. Mitchell, Salt Lake City, for amicus State of Utah Attorney General.

PER CURIAM:

¶ 1 Through a series of tragic personal decisions, spread over a period of years, Judge Joseph W. Anderson has effectively prevented himself from performing the duties of the office of juvenile court judge to which he was appointed. These choices, and their inevitable consequences, were first made known in the facts giving rise to the complaints, and recommendation for discipline, before the Judicial Conduct Commission, from which this action arises. Moreover, the choices and acts which most impact the outcome of this matter appear to have been undertaken primarily, if not solely, for the purpose of influencing the outcome of the Commission's inquiry.

¶ 2 Pursuant to our constitutional responsibility to review recommendations of the Judicial Conduct Commission, we have considered the Commission's report regarding Judge Anderson. The constitution directs us to review the recommendations as to both law and fact, and to accept and implement the recommendation, to reject it, or to modify the action proposed by the Commission, depending upon our conclusions after a thorough review of the matter. Utah Const. art. VIII, § 13. The overall purpose is to see that the interests of Utah's citizens, the

Judicial Department of state government, and the judge, in that order of priority, are protected. In addition, the constitutional directives to review as to both law and fact, and to take additional evidence where required, contemplate a review that may include facts or circumstances relating to not only the evidence heard by the Judicial Conduct Commission, but also events directly related to the Commission's proceedings and recommendation, including matters in mitigation or aggravation.

¶ 3 Because of the unique complications in Judge Anderson's case, we appointed a special master to take additional factual evidence on our behalf. Judge Anderson and his counsel participated fully in this additional fact-finding. We have also accepted written submissions from Judge Anderson, raising challenges to the factual findings of the special master, as well as other challenges to the process of judicial discipline in Utah, including concerns about the fairness of the Judicial Conduct Commission proceedings and structure. On these issues, we have received additional written submissions on behalf of the Judicial Conduct Commission, the legislature through its Office of Legislative Counsel, and from the Attorney General on issues related to the process and structure of the Judicial Conduct Commission. In addition, we have heard argument from Judge Anderson, the Judicial Conduct Commission, the legislature, and the Attorney General. We have carefully reviewed all of the materials submitted to us by the parties, as well as the record of proceedings before the special master, and the record of proceedings before the Judicial Conduct Commission.

¶ 4 Finally, unsure that Judge Anderson recognized the seriousness of the position he has placed himself in, we offered him an additional opportunity to address the court specifically on the question of how the apparent inability to resume his full caseload might be resolved short of his removal.

¶ 5 On the basis of these submissions, arguments, and reviews, we have concluded that through his own behavior, and by his own choice, Judge Anderson has created a situation from which he cannot now extricate himself, and which has made it virtually impossible for him to perform a significant portion of the duties of his office as a juvenile court judge. Although Judge Anderson is not solely responsible for the difficulties in which he now finds himself, the predominant causes are his actions, and the primary responsibility for avoiding such a situation is his alone.

¶ 6 The Judicial Conduct Commission recommended that Judge Anderson be given a public reprimand for engaging in conduct prejudicial to the administration of justice which brings a judicial office into disrepute, in violation of the obligations imposed upon him as a judge. We accept the findings of the Judicial Conduct Commission, but given the serious ongoing difficulty occasioned by Judge Anderson's conduct, we decline to adopt the recommended sanction. In its place, we conclude that Judge Anderson's behavior has been so prejudicial to the administration of justice as to both justify, and require, his removal from office.

## I. JUDICIAL DISCIPLINE IN UTAH

¶ 7 Because matters of judicial discipline rarely reach the level of discussion and dispute necessary for us to render an opinion, and because only three such instances have occurred since the creation of the Judicial Conduct Commission,[1] we exercise our prerogative to describe, more broadly than may be absolutely necessary to resolve Judge Anderson's case, the law as it relates to judicial discipline. We do so as a guide to the Judicial Conduct Commission to the degree that doing so is our responsibility, and for the reassurance of the public and judges that we recognize, and take most seriously, our role in the process.

¶ 8 With the modification and re-enactment of the Judicial Article to the Utah Constitution in 1984, the people of Utah vested responsibility for judicial discipline in three separate, and independent, processes.

---

1. *In re Young,* 1999 UT 6, 976 P.2d 581; *In re McCully,* 942 P.2d 327 (Utah 1997); *In re Worth-en,* 926 P.2d 853 (Utah 1996).

The first is reserved to the voters by article VIII, section 9, that of uncontested retention elections held periodically, by which the people may remove any judge at their pleasure by majority vote, for any reason. The second is vested in the legislature by article VI, sections 17–20, under which a judge may be impeached for "high crimes, misdemeanors, or malfeasance in office" by a two-thirds vote of the House of Representatives, and removed from office after trial by the Senate, again by a two-thirds vote. The third is charged to the Judicial Conduct Commission and this court, under article VIII, section 13.[2]

¶ 9 The people, through their constitution, have established the Judicial Conduct Commission for the express purpose of investigating and conducting confidential hearings on complaints against any justice or judge of this state. Utah Const. art. VIII, § 13. For any one or more of five enumerated reasons,[3] the Judicial Conduct Commission may order the "reprimand, censure, suspension, removal, or involuntary retirement" of any judge. *Id.* These sanctions are limited in two important ways by the language of the constitution. First, they may only be imposed for one of the enumerated reasons set out in the constitution. Second, no order of the Judicial Conduct Commission is implemented until the Supreme Court has reviewed "the Commission's proceedings as to both law and fact." *Id.* In this review, the court is empowered by the people to "permit the introduction of additional evidence" as it deems necessary and helpful. *Id.* Once the review is complete, the court must, "as it finds just and proper, issue its order implementing, rejecting, or modifying the Commission's order." *Id.*

¶ 10 As a consequence of this constitutionally mandated process, it ultimately rests with this court to render a final decision on the propriety and nature of any sanction imposed on a judge. The Judicial Conduct Commission acts in a role more akin to an independent advisory committee to the court in this important process, and not as an independent body with the power to impose consequences on a judge that are simply subject to appellate review by this court. Matters raised before, and acted upon, by the Judicial Conduct Commission have no disciplinary effect on a judge until and unless this court agrees that discipline is warranted, and sets the level of discipline to be applied. The Judicial Conduct Commission can insist that the court review a matter by entering an order of discipline, but its recommendation as to discipline remains just that, a recommendation.

¶ 11 Because of the nature of the relationship between the court and the Judicial Conduct Commission as established in the constitution, the court is obligated neither to accept the judgment of the Judicial Conduct Commission on matters of law or fact nor to adopt any recommended sanction. However, as a matter of constitutional deference, the court has treated, and most certainly will continue to treat, the findings and recommendations of the Judicial Conduct Commission with a significant degree of respect.

¶ 12 In addition, the purview of the Judicial Conduct Commission is necessarily limited to the scope of complaints made against a judicial officer. The court, on the other hand, responsible as it is for selection of the Chief Justice, the presiding adminis-

---

2.  The legislature argued before us that this court has inherent power to manage the judiciary, including discipline and removal of judges as necessary. We need not, and do not, reach the issue of our inherent powers in this regard. However, we note that to the extent that such power exists, it is vested in this court alone, and not in other agencies or branches of government. As a result, it is doubtful whether the legislature can, by statutory enactment, grant us power to discipline judges that the legislature itself does not possess under the constitution. *See, e.g.,* Utah Code Ann. § 78–8–103(3) (2002) (purporting to grant the court power to suspend judge if convicted of felony).

3.  These are:

    (1) action which constitutes willful misconduct in office; (2) final conviction of a crime punishable as a felony under state or federal law; (3) willful and persistent failure to perform judicial duties; (4) disability that seriously interferes with the performance of judicial duties; or (5) conduct prejudicial to the administration of justice which brings a judicial office into disrepute.

    Utah Const. art. VIII, § 13.

trative officer of the state judiciary, Utah Code Ann. § 78–21(3) (2002), and the State Court Administrator, the senior non-judge in the state judiciary, Utah Code of Judicial Admin. 3–301(3), has a unique relationship to both the judges and the judiciary as a whole. Given that perspective, the scope of exposure of the court is naturally greater than that of the Judicial Conduct Commission when considering the impact of alleged judicial misconduct on both the judiciary as a whole, and on the individual judge and his or her ability to function as a public official. The positioning of the court as the final arbiter of matters of judicial conduct by the constitution obligates us to consider, where essential to a resolution of the issue presented to the Judicial Conduct Commission, facts and evidence of ongoing difficulty directly resulting from or arising out of the matters upon which the Judicial Conduct Commission has deliberated and made its recommendation for sanctions to the court.[4] In most cases, the act or acts for which a judge is subjected to discipline through this process have been and will be discrete, specific behaviors. However, in rare cases, the behavior for which the Judicial Conduct Commission recommends discipline is of an ongoing nature that itself requires correction. In such cases, given the process of the Judicial Conduct Commission, only this court is in a position to consider and resolve any lingering difficulty. This we do not, and will not, undertake lightly. Only when such ongoing conduct presents both a serious problem for the judge in question, and also reflects a lack of correction of the problem addressed by the Judicial Conduct Commission, are we even remotely likely to involve ourselves at that level of inquiry. The case of Judge Anderson presents just such a difficulty, demanding the reluctant

exercise of our constitutional authority and responsibility.

## II. PROCEDURAL HISTORY AND BACKGROUND

¶ 13 By its formal order of reprimand, dated March 27, 2003 and filed with the court April 23, 2003, the Judicial Conduct Commission invoked the constitutional jurisdiction of the court to review, and to then implement, reject, or modify, the Judicial Conduct Commission's order of formal (public) reprimand [5] against Judge Anderson. Upon initial review of the submission from the Judicial Conduct Commission, with supporting record, the court determined that additional facts and evidence were required to complete the necessary evaluation of the action of the Judicial Conduct Commission. By order of referral dated June 4, 2003, the court directed Judge Anthony W. Schofield of the Fourth District Court, acting as our special master for the purpose, to conduct evidentiary hearings in the matter, and to return his report to the court by September 1, 2003.

¶ 14 As a result of delays in conducting the evidentiary hearings, primarily due to activities and requests of Judge Anderson, Judge Schofield completed his assignment, and delivered his findings and supporting documentation, on October 3, 2003.

¶ 15 We immediately issued our order directing the parties to prepare and present their briefs on the issues, and invited the participation of the legislature and the Attorney General, since Judge Anderson was challenging the constitutionality of the Judicial Conduct Commission's composition and process.

¶ 16 Briefs were filed by Judge Anderson, the Judicial Conduct Commission, the legislature, and the Attorney General. We have

---

4. We routinely inquire as to the attitude, condition, or progress of a judge at the time we consider implementing recommended sanctions from the Judicial Conduct Commission. Doing so assists us in determining the necessary and appropriate measure of discipline.

5. Although the Judicial Conduct Commission has made extensive use of what it refers to as informal, or private, reprimands, we find no basis in the constitution for such a sanction. In fact, doing so has generally prevented both the public,

and sometimes this court, from gaining any meaningful awareness of the extent and nature of judicial misconduct, if any, occurring within the judiciary. Should the Judicial Conduct Commission feel that no public sanction is warranted, dismissal of the complaint with a warning, or on conditions of no further misbehavior, may serve the same laudable purpose of correcting troubling but relatively minor misbehavior without offending the language of the constitution.

considered all the briefs, the voluminous record of the special master appointed by the court, the record of the proceedings before the Judicial Conduct Commission, and matters submitted in supplementation by Judge Anderson.

¶ 17 Oral argument was held on November 19, 2003. At that time, argument was allowed from Judge Anderson, the Judicial Conduct Commission, the legislature, and the Attorney General. Argument from the legislature and the Attorney General was only considered as to the constitutional challenges raised by Judge Anderson. A second hearing was held December 18, 2003 to allow Judge Anderson to specifically address the issue of possible solutions to the difficulty he faced as a result of the legal inability to hear a significant portion of the caseload of a juvenile court judge.

¶ 18 In this particular matter, the facts upon which the Judicial Conduct Commission relied in reaching its findings, conclusions, and recommendation were limited to the time period prior to the filing of the initial complaint against Judge Anderson, 1999 and 2000. The matter did not reach us for consideration until mid–2003. Consequently, the conduct from which the complaint and investigation arose had spawned additional consequences over the ensuing period, made known to the court through public statements on Judge Anderson's behalf, press reports of court filings by Judge Anderson, and administrative difficulties due to his actions, which were directed to the Chief Justice for consideration and solution. We also received, and granted, a petition for review of an order entered by the Utah Court of Appeals which by its terms barred Judge Anderson from hearing any cases involving the Attorney General's office as counsel for the Division of Child and Family Services.[6] Briefs in that matter reflected considerable difficulties existing between Judge Anderson and the offices of the Attorney General and of the Guardian ad Litem arising from the same complaints made to the Judicial Conduct Commission in the matter now before us. As such, we have also taken notice of these matters.

¶ 19 Because of the nature of the conduct addressed in the original complaint, Judge Anderson's chosen responses to the late cases as well as to being challenged on his responses, and because of Judge Anderson's retaliation against the complainant, we found it useful and necessary to seek additional factual evidence relating to the direct impact of Judge Anderson's behavior arising from the circumstances giving birth to the original Judicial Conduct Commission complaints. To do so, since this court is neither structured for nor skilled at the taking of direct evidence, we exercised our authority to appoint a special master to act as our direct agent in collecting additional evidence on these matters.

¶ 20 Because trial judges are skilled and experienced in taking evidence, we appointed a trial judge from a district other than that in which Judge Anderson was appointed to act as our special master. Over a period of many weeks, the master conducted extensive factual hearings in which Judge Anderson and his counsel played an active part. The master submitted transcripts of the hearings, copies of all exhibits and documents submitted, and a report of eighty-four pages in which he identified facts derived from the evidence presented, and on which he responded to specific inquiries we made in our order of appointment.

¶ 21 We rely upon those factual findings of the special master as presented to us.

## III. FACTUAL BACKGROUND OF THE CONDUCT AT ISSUE

¶ 22 Judge Anderson was appointed as a juvenile court judge in the Third Judicial District in 1995. He was retained by the voters at the general election in 1998. During his term of office, Judge Anderson has been required, as are his colleagues, to hear cases involving the abuse, neglect, and dependency of children. These cases, generally referred to as child welfare cases, are managed under strict time requirements imposed by statute. Although many of these deadlines are onerous, and often force equally important matters involving children to be

6. *State v. Oddone,* No. 20020454–CA (Utah Ct. App.2002).

delayed, they are the law, and have been during Judge Anderson's term of office.

¶ 23 During the period from which the original Judicial Conduct Commission complaints arose, 1999–2000, Judge Anderson had significant difficulty managing his child welfare cases in compliance with statutory deadlines for hearings and action. His difficulty resulted in parties before him seeking the intervention of the court of appeals to force timely compliance. On repeated occasions, the court of appeals ordered Judge Anderson to comply. Judge Anderson, for whatever reasons, did not fully do so.

¶ 24 One of the regular participants in child welfare cases is the Office of the Guardian ad Litem. A guardian ad litem is appointed to represent the interests of the child, as required by statute.[7] The participation of the Office of the Guardian ad Litem is not optional in child welfare cases.[8] Similarly, the Attorney General is most often a participant in child welfare proceedings before the juvenile court, as required by statute.[9]

¶ 25 Both the Office of the Guardian ad Litem and the Attorney General participated in efforts in 1999 and 2000 to resolve the difficulty with the timely handling of child welfare cases in Judge Anderson's court. In part because Judge Anderson refused to accept responsibility for the difficulty, no solution was reached in either a formal or an informal way, although both were attempted.

¶ 26 Noting these difficulties and the fruitless efforts to correct the problem, in June 2000, the Director of the Office of the Guardian ad Litem submitted a request for investigation of Judge Anderson's conduct to the Judicial Conduct Commission. Specifically, the request sought investigation of Judge Anderson's inability to timely conduct hearings or issue decisions in child welfare matters, to the prejudice of children represented by the Office of the Guardian ad Litem.

¶ 27 By fall 2000, the investigation was underway, with the Judicial Conduct Commission staff conducting a series of inter-

views to pursue an understanding of the facts and circumstances related to the complaint and its allegations. On December 8, 2000, the Judicial Conduct Commission, pursuant to its rules of procedure, issued a notice of the commencement of formal proceedings against Judge Anderson based upon facts and issues generated by the complaint from the Office of the Guardian ad Litem, and the staff investigation.

¶ 28 At about the same time, Judge Anderson entered, on his own motion, orders of disqualification in a number of cases in which attorneys from the Office of the Guardian ad Litem, or the Attorney General, appeared. The Attorney General was included because attorneys from that office had responded to the process of the Judicial Conduct Commission and given statements regarding Judge Anderson's performance. In his order, Judge Anderson said that the Office of the Guardian ad Litem had filed a Judicial Conduct Commission complaint against him, and that the office of the Attorney General had provided support for the complaint and had vowed to force him from the bench. As such, said Judge Anderson, his impartiality could reasonably be questioned, and he was ethically required to recuse himself from cases involving those two offices. Although it was only in specific cases that Judge Anderson then disqualified himself, it was clear at the time, to both Judge Anderson and his colleagues on the Third District Juvenile Court, that having taken that position, Judge Anderson should not, and likely could not, hear any other child welfare matters since they all involved attorneys from the Office of the Guardian ad Litem and the Attorney General.

¶ 29 Since November 8, 2000, the date of Judge Anderson's notice of his disqualification from hearing child welfare cases, he has not heard cases of that type. His share has been handled by other judges who volunteered or were assigned to do so for discrete periods, or the cases were absorbed by his

---

7. Utah Code Ann. §§ 78–3a–314(3)(5), –912(2) (2002).

8. *Id.*

9. *Id.* § 78–3a–116(2)(b) (Supp.2003).

colleagues on the Third District Juvenile Court bench.

¶ 30 Although Judge Anderson has since expressed willingness to reassume his load of child welfare cases, the circumstances originally leading to his disqualification from those cases have not been resolved, nor has Judge Anderson taken sufficient action to do so.

¶ 31 During late 2001, Judge Anderson chose to file a civil complaint in the United States District Court for the District of Utah, naming the executive directors of the Judicial Conduct Commission and of the Office of the Guardian ad Litem, as well as the Chairman of the Judicial Conduct Commission, as defendants. The suit alleged various deprivations of Judge Anderson's protected rights under the United States and Utah constitutions, by virtue of the complaint, process, and proceedings of the Judicial Conduct Commission. The allegations of the suit were verified as true by Judge Anderson.

¶ 32 The federal lawsuit makes specific allegations regarding the conduct of the Director of the Office of the Guardian ad Litem and attorneys under her direction, indicating that their representation of children in Judge Anderson's court was deficient in a number of important respects. The federal complaint specifically accuses the Director of the Office of the Guardian ad Litem of initiating the Judicial Conduct Commission complaint knowing that the issues had been previously resolved and corrected, and of conspiring to deprive Judge Anderson of both his position on the bench and his constitutionally protected rights in the process.

¶ 33 Judge Anderson filed an amended complaint in the federal suit on December 20, 2001, in which he named the Director of the Office of the Guardian ad Litem as a defendant personally, not only in her representative capacity as in the first complaint, and sought money damages against her. As before, the amended complaint made direct allegations against the Director of the Office of the Guardian ad Litem in which Judge Anderson asserted, among other matters, that filings from the Director with the Judicial Conduct Commission constituted retaliation against Judge Anderson, and that the complaint to the Judicial Conduct Commission contained false statements by her about him.

¶ 34 When questioned about the amended complaint, Judge Anderson indicated that the filing was in response to the filing of a second Judicial Conduct Commission complaint by the Director of the Office of the Guardian ad Litem against Judge Anderson. However, Judge Anderson had been notified of the second complaint more than two weeks prior to the filing of his first federal complaint. No further explanation was forthcoming.

¶ 35 Since the filing of the amended complaint by Judge Anderson in federal court, any matter involving representation by the Office of the Guardian ad Litem assigned to Judge Anderson has generated a motion to recuse Judge Anderson for reason of expressed bias against the attorneys of that office, including the Director.

¶ 36 By August 2002, Judge Anderson's inability to hear child welfare cases had reached a point of severely affecting his relationships with his judicial colleagues and resulted in an effort by the then-Presiding Judge of the Third District Juvenile Court to reassign Judge Anderson to child welfare cases involving the Office of the Guardian ad Litem despite concerns for Judge Anderson's expressed bias. A motion by the Office of the Guardian ad Litem resulted in an order denying the attempt to recuse Judge Anderson on twenty-one specific cases. In that order, the Presiding Judge cited, among other reasons for his denial of the motion, the "horrendous and appalling impact on the ability of the Third District Juvenile Court to meet its statutory obligations to hear cases" as a result of Judge Anderson's prior disqualification, as well as the fact that it was "administratively impossible for another juvenile court judge to assume Judge Anderson's cases, handle their own cases as well, and meet the time constraints of the Child Welfare Act." Noting the difficulties inherent in disqualifying a judge from a significant portion of the judge's caseload for a protracted and indeterminate period of time because of antipathy between the judge and a lawyer or firm, the Presiding Judge denied

the motion to disqualify Judge Anderson, relying on the absence of proof of actual bias.

¶ 37 The court of appeals reversed the presiding judge,[10] not only ordering Judge Anderson's disqualification in the twenty-one enumerated cases, but in all cases then pending, and to become pending, that involved the Office of the Guardian ad Litem. Thereafter, the Attorney General sought a similar order of disqualification. The Presiding Judge again denied the request, and again the order was reversed by the court of appeals, again with present and prospective effect.[11] The Presiding Judge sought our review of the second decision of the court of appeals on petition for certiorari, which was granted and consolidated for decision with this matter. *See State v. Oddone,* 2004 UT 8.

¶ 38 Since November 2000, when Judge Anderson entered his original order of disqualification with respect to cases involving the Office of the Guardian ad Litem and the Attorney General, Judge Anderson has been assigned a variety of matters ranging from juvenile court delinquency proceedings in which neither the Office of the Guardian ad Litem nor the Attorney General appeared, to temporary assignment as an acting district court judge. He has not, however, been given a full assignment of the duties of a juvenile court judge in more than three years.

## IV. SPECIFIC FINDINGS OF THE JUDICIAL CONDUCT COMMISSION AND THEIR IMPACT

¶ 39 The Judicial Conduct Commission limited the scope of its final order to eleven specific instances of untimely action by Judge Anderson. We find nothing in the additional evidence, the briefing, or the arguments before us that brings either the factual findings or the legal conclusions of the Judicial Conduct Commission into doubt.

¶ 40 Moreover, the specific difficulty identified by the Judicial Conduct Commission is the essential basis of the difficulty Judge Anderson now finds himself in, and into which he has plunged his colleagues on the

Third District Juvenile Court bench: his untimely action on cases assigned to him; his reactions to challenges to his untimely action on those cases; and his reaction to the activities of the Judicial Conduct Commission in review of his untimely action on cases. Judge Anderson has demonstrated an inability to take responsibility for his own actions, particularly with respect to delays beyond those experienced by other judges in similar circumstances. He has instead attributed the difficulties with timely performance to the court staff and to the parties and counsel appearing before him. His resistance to suggestions from court administrators, clerical help, his colleagues, his presiding judge, and others resulted in not only a lack of correction of the difficulties described by the Judicial Conduct Commission, but also an exacerbation of those circumstances, including publicly attributing the difficulties to the ill will and bad intentions of the Director of the Office of the Guardian ad Litem, the attorneys of the Office of the Guardian ad Litem, and the attorneys of the Attorney General's office. By attributing blame and improper motives to the attorneys of the Office of the Guardian ad Litem and the Attorney General, as well as very specifically to the Director of the Office of the Guardian ad Litem, Judge Anderson has created, principally of his own making, a quagmire from which he cannot extract himself, while simultaneously bringing disrepute on himself as a judge and on the judiciary as a whole.

¶ 41 Judge Anderson cannot perform the duties of his office. This is because he is disqualified from hearing a substantial portion of the caseload comprising the bulk of his duties of office. He is disqualified because, first, he voluntarily disqualified himself in November 2000, and second, because since that time, he has demonstrated on the public record that he has personal animus for the attorneys of the Office of the Guardian ad Litem and the Attorney General, resulting in the public appearance of bias, as well as demonstrated actual bias. Without attorneys from those two offices, Judge Anderson cannot hear child welfare cases. Without child

---

**10.** *Office of Guardian ad Litem v. Oddone,* No. 20020704–CA (Utah Ct.App.2002).

**11.** *State v. Oddone,* No. 20020454–CA (Utah Ct. App.2002).

welfare cases in his caseload, Judge Anderson cannot perform the duties of his office. Judge Anderson's inability to perform his duties places an undue burden on the children and families whose matters would have been assigned to him, as well as upon the Third District Juvenile Court. It reduces the capacity of the judiciary to hear and timely resolve the critically important matters that would otherwise be assigned to Judge Anderson, or his successor in office, and creates a "horrendous and appalling impact on the ability of the Third District Juvenile Court to meet its statutory obligations," as the presiding judge wrote in his order on recusal.[12] More significantly, however, his actions have denied Utah's citizens a neutral, effective, law-abiding judicial officer, thereby diminishing the overall effectiveness and reputation of the judiciary.

## V. JUDGE ANDERSON'S CHALLENGES

¶ 42 Judge Anderson, in response to the recommendation of the Judicial Conduct Commission that he be disciplined, raises a number of challenges. First among those are challenges to the constitutionality of the composition of the Judicial Conduct Commission, the constitutionality of the process followed by the Judicial Conduct Commission, and the constitutionality of the process of this court in appointing the special master.

¶ 43 He also raises issues regarding the constitutionality of two statutes that specify time frames within which he was required to take actions, the failure of which resulted in the recommendation of discipline, and the constitutionality of his being disciplined as a result of exercising his "right" to file the federal lawsuit.

¶ 44 Finally, he raises a number of other issues regarding specific findings of the Judicial Conduct Commission and the special master, issues regarding bias by members of the Judicial Conduct Commission and the

12. Order Denying Guardian ad Litem's Motion to Recuse dated August 23, 2002.

13. These motions include: (1) motion to dismiss, (2) appeal of the special master's order concerning review of files, (3) appeal of the special master's refusal to allow evidence, (4) request for

allegedly improper recusal by one member of the Judicial Conduct Commission, evidentiary rulings by the special master, the thoroughness of the investigation by the Judicial Conduct Commission staff, and attribution of delay to Judge Anderson for which he claims no responsibility.

¶ 45 Including sub-issues, Judge Anderson presents some fifty-two issues for our review. He has also filed an additional seven motions[13] for us to consider, and a continuing series of supplemental filings. We have considered carefully all of his arguments and submissions. Some we find to be totally without merit, and will address no further. The others we address in turn. First, however, we must consider the objection raised by the Judicial Conduct Commission, and joined in by the Attorney General, that Judge Anderson's failure to raise before the Judicial Conduct Commission certain of the issues he now argues before us is fatal to consideration of those issues at this late stage.

## VI. PRESERVATION OF ISSUES

¶ 46 The rules of appellate procedure apply to all matters before this court. However, not all matters before this court are appeals. Some cases reach us in a different posture. Judicial discipline and lawyer discipline in particular, are essentially original proceedings here. In the case of lawyer discipline, the authority to discipline lawyers rests entirely with this court and is delegated by our rules to the Utah State Bar for some functions, and to the district courts for others. Utah Const. art. VIII, § 4; Utah Rules of Lawyer Discipline and Disability 10(a), 18, 19, 23–25. In both cases, they act under our original authority, and matters eventually brought to us for action come not as appeals, but by way of final confirmation or rejection of actions taken by our delegees.

remand to the special master for additional fact finding, (5) objections to the special master's report, (6) motion to amend the special master's report, and (7) motion to make additional findings.

■■ ¶ 47 Judicial discipline, under our constitution, is not vested entirely in our hands. The Judicial Conduct Commission has an express grant of authority and responsibility, ending with either exoneration of the charge or a recommendation for discipline forwarded to us in the nature of an "order" for sanctions. Utah Const. art. VIII, § 13. However, the order may be enforced against the judge only upon our agreement and implementation of the order. *Id.* In that process, we are required to review the proceedings of the Judicial Conduct Commission as to both law and fact, take additional evidence as needed, and enter an order as seems to us just and proper under the circumstances. We have no obligation to defer to the Commission. *Id.* This is very unlike the nature of an appeal from an administrative body, one empowered to decide matters, enter orders, and seek direct enforcement of those orders. In the case of administrative agencies, we review their actions as an appeal, never take additional evidence, and are always bound to defer, to some extent, to the determinations of the agency. In agency appeals, therefore, it is logical to require matters that may be dispositive to be presented in the first instance to the agency, so that it may consider them at the time of reaching its decision. Failure to do so, as correctly noted by the Judicial Conduct Commission, is usually a bar to later consideration. But in the case of judicial conduct matters, where this court is at liberty to raise, and rely upon, issues considered by neither the judge nor the Commission during their interaction, it would be grossly unfair to prevent a judge from raising serious issues that may bear on the proper resolution of the matter. No such bar exists.

¶ 48 That said, it is obvious that to the degree possible, a judge and the Commission both benefit from a full exploration of the relevant issues, and the need for action by this court might be eliminated as a result. Good practice dictates that issues should be raised at the earliest possible moment in proceedings, notwithstanding the right to do so later.

## VII. CONSTITUTIONAL CHALLENGES

### A. Composition of the Judicial Conduct Commission

■ ¶ 49 Judge Anderson raises challenges to the constitutionality of the Judicial Conduct Commission as presently constituted. He argues, as has been done before in *In re Young*, 1999 UT 6, 976 P.2d 581, that the inclusion of four members of the legislature on what is essentially a judicial body violates the Utah constitution's prohibition on one branch of government exercising authority reserved to another. He invites us to revisit and reverse our decision in *Young*, simply on the grounds, apparently, that we got it wrong last time. We decline this invitation. We see no basis upon which the decision in *Young* must be reversed, and here reaffirm our holding that the composition of the Judicial Conduct Commission does not violate the separation of powers protections of the constitution.

### B. Judicial Conduct Commission Process

¶ 50 Next, Judge Anderson alleges a number of infirmities in the process employed by the Judicial Conduct Commission. Some of these, he says, amount to a deprivation of due process, as guaranteed him by the United States Constitution and the Constitution of Utah. Those of consequence we address in turn.

#### 1. One-tier Process

■ ¶ 51 The first challenge to the Judicial Conduct Commission's process is a challenge to its division of duties. Judge Anderson urges that allowing the Commission itself to investigate, prosecute, and adjudicate claims against judges creates too great a risk of bias to be constitutionally permissible. Judge Anderson cites no constitutional provision as being violated, but we assume his reference is to due process under the United States Constitution. He also cites no relevant case law in support of his argument, nor did he make a meaningful argument on the point at oral argument.

¶ 52 This type of argument was addressed by the United States Supreme Court in *Withrow v. Larkin*, 421 U.S. 35, 95 S.Ct.

1456, 43 L.Ed.2d 712 (1975), a case involving combined investigative and adjudicative functions of a medical board authorized to discipline physicians. Analogously, the Court noted that trial judges often make pre-trial determinations of probable cause (similar to the action taken here by the Judicial Conduct Commission in voting to proceed with formal charges against Judge Anderson) and then preside over a criminal trial related to those charges. *Id.* at 56, 95 S.Ct. 1456. In *Withrow,* the Court found no constitutional difficulty with this process. *Id.* Here the Judicial Conduct Commission's involvement is limited to evaluation of the charges for purposes of determining whether formal proceedings should be commenced, and then adjudicating the charges based upon the evidence adduced at the hearing.[14]

¶ 53 The Judicial Conduct Commission's duty to investigate and prosecute allegations of misconduct against judges is delegated to the Commission staff. The Judicial Conduct Commission itself acts only on questions related to proceeding with a formal case after the initial investigation is complete, and in the adjudication of the charges after notice to the judge, and in a hearing at which evidence is adduced. We see no constitutional infirmity with this process.

## 2. Complaints

¶ 54 The next challenge regards the current Judicial Conduct Commission practice of treating as a complaint, for purposes of investigation and action, not only those matters raised in communications from persons outside the Judicial Conduct Commission, but also matters raised by staff and members of the Commission. This process is authorized by Utah Code section 78–8–101(2), which defines "[c]omplaint," saying:

> "Complaint" also includes the executive director of the commission's written statement of the allegation based on reliable information received in any form, from any source, that alleges, or from which a reasonable inference can be drawn that a

judge is in violation of any provision of Utah Constitution Article VIII, Section 13. Utah Code Ann. § 78–8–101(2) (2002).

¶ 55 In *In re Worthen,* 926 P.2d 853 (Utah 1996), we declared unconstitutional the same practice, which had been adopted by the Commission as part of its rules. Our reasoning then was that the provisions of article VIII, section 13 "merely permit[ ] the Commission to 'investigate and conduct confidential hearings *regarding complaints* against any justice or judge.'" 926 P.2d at 877 (quoting Utah Const. art. VIII, § 13). Since that time, in apparent response to *Worthen,* the legislature enacted section 78–8–101(2). The legislature did this pursuant to the authority granted it in article VIII, section 13 to establish the composition and procedures of the Commission.

¶ 56 We reaffirm our holding in *Worthen* that any attempt by the Judicial Conduct Commission, or its staff, to initiate action against a judge or justice absent a complaint brought by someone else "exceeds the Commission's grant of authority by article VIII, section 13 of the Utah Constitution." 926 P.2d at 877. To the degree that section 78–8–101(2) violates this prohibition, it is unconstitutional. However, once a complaint has been brought by someone not a member of or staff to the Commission, it is clearly within the authority and duty of the Judicial Conduct Commission to investigate the facts giving rise to that complaint, and to fashion charges of judicial misconduct as may be supported by the evidence adduced in that investigation.

¶ 57 In Judge Anderson's case, verified complaints were brought against Judge Anderson by persons not part of the Commission. The investigation into those allegations resulted in charges that were ultimately considered and acted upon by the Commission. We find no impropriety in Judge Anderson's case.

### C. Supreme Court Review

¶ 58 Judge Anderson also expresses concern over the relationship between the dis-

---

14. In Judge Anderson's case, a number of the charges were dismissed by the Commission in the course of the proceedings. Such a dismissal strongly suggests that the Commission was able to overcome any suggestion of bias in the process.

ciplinary power of the Judicial Conduct Commission, to which members of the Utah Supreme Court are also subject, and the ultimate impartiality of the review conducted by the supreme court under this cloud of restraint.

¶ 59 In order for Judge Anderson's concerns to be realized, both the majority of the Judicial Conduct Commission and the majority of this court would be required to abandon their respective oaths of office and their commitments to support, obey, and defend the constitution of Utah, and act in selfish disregard for the truth, all in an effort to mete out an unjust sanction to another judge. We find no merit in this concern.

¶ 60 Judge Anderson, his judicial colleagues, and the people of Utah may rest assured that given the supreme court's final action on any recommendation for judicial discipline, the individual members of the court do not feel threatened, or unduly constrained, by the fact that they too are individually accountable for ethical behavior, and may be subject to review by the Judicial Conduct Commission. We are much more constrained by our individual and collective belief that the rule of law and the fair and impartial application of law to facts are vastly more important than the individual or collective careers of any of us. We are, after all, public officials who may also be removed by the legislature [15] by the process of impeachment when appropriate, or by the people at any retention election. Judges are not promised job security in this state. They are promised a system that will be fair, and that they will only be held to account for their actions on the basis of fair and equitable evaluations by the Judicial Conduct Commission, the legislature, and the people.

### D. Special Master

■ ¶ 61 Next, Judge Anderson asserts that the Utah Supreme Court has no authority to appoint a special master to take addi-

tional evidence. As we observed in *Worthen*, "while the constitution does permit this court to take additional evidence, we have no ready mechanism for doing so." 926 P.2d at 864. There can be no question that the language of the constitution, article VIII, section 13, authorizes the court to "permit the introduction of additional evidence" in the process of our factual and legal review. How such evidence is to be introduced is left to our discretion. We have suggested in the past that the introduction of evidence by sworn affidavit and additional evidentiary proceedings before the Judicial Conduct Commission are available to us. *Id.* Clearly, the appointment of a master is a traditional and time-honored mechanism for accomplishing the same purpose. In fact, inasmuch as we hold no authority to command the Judicial Conduct Commission to reopen its work once it submits its recommendation to us, remand may well be a matter of discretion on the part of the Commission, rather than on the part of this court.

¶ 62 We find no merit in Judge Anderson's concern, and reject his challenge to our authority to appoint a special master as our agent to collect additional evidence.

### E. Statutes Imposing Decisional Deadlines

■ ¶ 63 Judge Anderson claims that the legislature has exceeded its constitutional authority by imposing deadlines on the judiciary in conducting what is the very essence of core judicial function, the scheduling and deciding of cases. Specifically, Judge Anderson challenges the constitutionality of Utah Code section 78–3a–308(2), which imposes a requirement on juvenile courts to hold a final adjudication hearing in certain child welfare cases "no later than 60 calendar days from the date of the shelter hearing," and Utah Code section 78–7–25(1), which requires that a judge of a trial court "shall decide all matters submitted for final deter-

---

15. Judge Anderson also raises a question about our ability to withstand the threat of legislative displeasure. Again, the members of this court, now, in the past, and in the future, come to their posts recognizing that they are part of a system of government that entails stresses and checks and balances, and are part of a branch of that government that lacks either sword or purse to protect itself from the others. The courts must rely on the rule of law, and the ultimate ability to declare any infringement by the other branches in the exclusive business of the judiciary unconstitutional. Historically, this has proven sufficient.

mination within two months of submission, unless circumstances causing the delay are beyond the judge's personal control." Judge Anderson argues that he cannot be held to account for violation of either of these two statutes, as the Judicial Conduct Commission has done, because it is beyond the power of the legislature to set deadlines for judges to accomplish what is clearly the central function of the judiciary, that of holding hearings and making judgments.

¶ 64 While there may be merit in Judge Anderson's claims,[16] Judge Anderson does not argue that his constitutional objection to the statutory deadlines was the reason he failed to observe those deadlines. If Judge Anderson had been motivated by a constitutional objection in refusing to observe the statutory deadlines, he could have cited such an objection as his reason when refusing to adjudicate a particular case within the statutory period, thus establishing a record of his grounds for decision that could then have been appealed. Alternatively, he could have sought a declaratory judgment that the statutory requirements were unconstitutional. Judge Anderson took neither of these actions. As a result, Judge Anderson's constitutional argument is raised too late to be of help.

¶ 65 We do not hold that Judge Anderson has failed to preserve this constitutional argument. Rather, we express the view that by failing to record his constitutional objection to the deadlines in the cases before him, or in an action for declaratory judgment, Judge Anderson has failed to register his objection in any way contemporaneous with his refusal to observe the statutory requirements. He has therefore given us no reason to believe that constitutional principle motivated that refusal. Judge Anderson cannot therefore excuse his failure to obey the statute's requirements after the fact by applying a rationale attacking those deadlines when that rationale plainly played no role in his refusal to observe the statutory deadlines for adjudicating cases.

¶ 66 What follows from this is not that Judge Anderson had no right to press a constitutional claim against the statutory deadlines. What follows is that the appropriate standard of behavior for a judge is to observe the law as it exists at the time, and if he seeks to challenge it, to set forth his reasoning in a record of decision in a case before him or to bring an action seeking a declaratory judgment at the time the law's requirements allegedly infringe on his constitutional rights or otherwise offend the constitution. It cannot be acceptable behavior for a judge to fail to obey the law without at the time providing any reason to believe a constitutional objection motivated the failure, only years later in disciplinary proceedings to unveil a constitutional objection.

¶ 67 Judge Anderson has no recourse now to a challenge of the statute itself. Judges are held to a very high standard in this regard. Judge Anderson is no exception.

### F. Filing the Federal Lawsuit

¶ 68 In filing a civil action in the federal courts against the Judicial Conduct Commission and others, Judge Anderson exercised his right to petition for redress of grievances. However, as a judge, he has other burdens.

¶ 69 Judge Anderson's decision to sue in federal court to challenge the constitutionality of aspects of the Judicial Conduct Commission's process and composition has no direct impact on his ability to perform his duties. As such, the decision to bring the action is not a concern in our review of the facts and circumstances of this case.

¶ 70 However, Judge Anderson's decision to add allegations about the attorneys who initiated or supported complaints about him with the Judicial Conduct Commission is a concern. While Judge Anderson is free to sue whomever he wishes, as are all citizens,

---

16. We need not, and do not, reach the question of whether the legislature has the power to set such deadlines. However, at first blush, it does appear that the judicial power has been entirely vested in the supreme court, the district court, and such other courts as may be established by legislation. There does not appear to be a reservation to the legislative branch of any authority to set rules of process or procedure for the courts, particularly with respect to core functions.

he is also subject to the consequences of such a decision.[17] Taking Judge Anderson at his word in the verified federal complaint and amended complaint, he believed that the attorneys from the Office of the Guardian ad Litem and the Attorney General were engaged in some sort of conspiracy to wrongfully remove him from his position as a public official. Saying so was an expression of bias, and prevented Judge Anderson from ethically hearing cases involving those attorneys.

¶ 71 Judge Anderson's decision to address in a public forum his beliefs about the integrity and professionalism of attorneys who appear before him carries with it certain consequences. In this instance, his constitutional challenges to the Judicial Conduct Commission could have been raised without the allegations regarding the attorneys. No constitutional claims are served by his ill-tempered charges. We therefore find no merit in his claim that asserting his constitutional rights has somehow resulted in his discipline. Even if it were so, he has not been prevented from asserting his rights, but rather only from avoiding the inevitable consequences of his choice to include claims about attorneys appearing before him as part of that exercise.

## VIII. OTHER CHALLENGES

### A. Objections to Findings

¶ 72 Judge Anderson expresses concern about findings made by both the Judicial Conduct Commission and the special master. One concern centers on Judge Anderson's belief that both the Commission and the special master must consider facts related to the question of whether the delay evidenced in Judge Anderson's behavior is widespread among other juvenile court judges. We reject this challenge for two reasons. First, our decision in *Worthen* does not require the Judicial Conduct Commission to find, or even consider, whether or not a practice is widespread, if the practice violates clear mandates of law. It is the context of the unethical or improper behavior that matters in our review. In instances where clear court rules or statutory requirements are not

at issue, additional context, including where appropriate the general practices of other similarly situated judges, may be necessary. *Worthen,* 926 P.2d at 874–75.

¶ 73 Second, even allowing the possibility that the delays are widespread among the juvenile bench, it is Judge Anderson's response to that challenge that brings him before us today, and not his colleagues.

### B. Recusal of Judge Bench and Alleged Bias of Commissioners

¶ 74 Judge Anderson complains that he has been prejudiced in the decision of the Judicial Conduct Commission by the recusal of Judge Russell Bench, one of the Commission members. Judge Bench gave no reason for his recusal, nor was he required to do so. In fact, expressing reasons for recusal may lead to improper impressions being given to other members of the tribunal, creating the possibility of less fairness, not more. In this matter, Judge Anderson is not entitled to a tribunal of his choosing. He is entitled to a fair and neutral tribunal. We also see no merit to Judge Anderson's other concerns regarding the neutrality of the Commission.

## IX. PROPER SANCTIONS

¶ 75 The Judicial Conduct Commission has proposed a public reprimand be issued to Judge Anderson for his failure to timely hear and decide the eleven matters cited in the order issued by the Commission. The Judicial Conduct Commission determined that "Judge Anderson's failure to hold the nine adjudication hearings in a timely manner, and his holding of the two cases under advisement for a period in excess of two months, constitutes a pattern of disregard and indifference to the law" and thereby "violated Code of Judicial Conduct Canon 2A, which requires judges to 'respect and comply with the law,'" resulting in "conduct prejudicial to the administration of justice which brings the judicial office into disrepute." Ordinarily, we would not propose a sanction more drastic than that ordered by the Commission in a case involving specific,

---

**17.** *In re McCully,* 942 P.2d 327, 333 (Utah 1997) (holding that judge could exercise right to free speech but would subject herself to judicial discipline).

discrete failures to conduct court business in keeping with legal requirements. However, Judge Anderson's case does not involve only those discrete events identified by the Judicial Conduct Commission.

¶ 76 In *Worthen,* we carefully defined the elements necessary to establish the constitutional ground for discipline based on "conduct prejudicial to the administration of justice which brings a judicial office into disrepute." 926 P.2d at 870–72. In brief, conduct prejudicial to the administration of justice that brings the judicial office into disrepute is: (1) conduct (2) that is at least negligent if it occurs within the judge's judicial capacity, or willful if outside the judge's judicial capacity, and (3) that reflects a breach of the ethical canons applicable to judges as contained in the Code of Judicial Conduct. *Id.* Further, this "unjudicial conduct" must be: (4) prejudicial to the administration of justice, meaning that it is conduct that tends to injure or impair, is hurtful to, damaging to, or detrimental to, the activities that constitute the administration of justice, including the entire range of activities and functions of the judicial system. *Id.* Finally, the conduct must: (5) bring the judicial office into disrepute, meaning conduct that has "the effect of lowering public esteem for a particular judicial office and thus tend[s] to lower public esteem for the entire judiciary so as to reduce its effectiveness." *Id.* at 871.

¶ 77 In Judge Anderson's case, the Judicial Conduct Commission found that his failure to abide by the requirements of statutes directing the cases at issue to be decided in a timely manner, within the specified period, constituted conduct prejudicial to the administration of justice which brought his judicial office into disrepute. We agree.

¶ 78 In addition, as we have done in nearly every case referred to us by the Judicial Conduct Commission, we have reviewed the current status of Judge Anderson's behavior directly related to the charges brought and adjudicated by the Commission. We have sought additional evidence, as described above, on the question of how Judge Anderson has handled the difficulty that led to the action by the Judicial Conduct Commission. A review of this type is necessary for us to evaluate the suitability and propriety of the sanction recommended by the Judicial Conduct Commission. In cases where the sanctioned behavior has fully ceased, and the judge has evidenced through alternative behavior that the problem is unlikely to recur, we are inclined to see the problem as at least partially resolved, and are unlikely to depart from the recommendation of the Judicial Conduct Commission to direct more severe discipline for the judge. In cases where the sanctioned behavior has continued, or has directly led to more serious breaches of judicial conduct restrictions, we may be forced to consider more serious sanctions. In this case, that sanction is the removal of Judge Anderson from judicial office.

¶ 79 Because it is the most severe sanction which we may impose, we remove a judge from office only after solemn and deliberate consideration. As holders of judicial office ourselves, we are mindful of the rigors judges endure in the judicial selection, evaluation, and retention processes, rigors which well serve the citizens of Utah by populating our judicial branch with able public servants. We are, therefore, acutely aware of the human and professional distress that accompanies the loss of a position so hard won. Our preeminent duty is, however, to the public which we serve, and that duty demands that we not flinch when convinced that removal of a judge is a necessary sanction for misconduct.

¶ 80 Upon taking up judicial office, judges surrender no small measure of the rights to political participation and social intercourse enjoyed by citizens generally. They do so in the interests of preserving the integrity of the judicial branch of government, integrity that has as its hallmarks impartiality and uncompromising fidelity to the rule of law. Most judges wear the burden of the limitations on their conduct lightly, although from time to time most also find it necessary to pinch off the impulse to express passionately held views or participate in benign mischief. The demands on judges to elevate the effective administration of justice and preservation of public esteem for judicial office over personal interests can extend to and limit a

judge's options to defend against allegations of misconduct. For reasons known only to himself, Judge Anderson has engaged in a course of conduct animated by a single disturbing theme: the denial of blameworthiness for his actions, and a concomitant unwillingness to find a way to do his job.

¶ 81 Judge Anderson has coupled his steadfast refusal to accept responsibility for his actions with wide-ranging accusations directed at others, both within and outside the courts, for his tardy decisions in child welfare cases. The master found these conclusions to be widely shared by Judge Anderson's colleagues. The master noted that "[i]t is the nearly unanimous opinion of the judges of the Third District Juvenile Court that Judge Anderson could have and should have done something long ago to bring to resolution his disqualification from hearing large classes of cases." The master added, "[C]entral among these frustrations is the feeling, expressed by several but attributed more widely, that Judge Anderson has not taken ownership of these problems, pointing the blame elsewhere. These frustrations are genuine and have a basis in fact."

¶ 82 Judge Anderson now recognizes the difficulty he has imposed on his judicial colleagues, the appellate courts, the attorneys of the Office of the Guardian ad Litem and the Attorney General, on the clients of those attorneys, and on the staff and other participants in child welfare cases brought in the Third District Juvenile Court over the past three-plus years. He has now, belatedly at best, attempted to take steps to alleviate at least a portion of the ongoing difficulty he has caused. Obviously, he cannot relieve any of the past difficulty he has created.

¶ 83 Judge Anderson's retaliation and intemperate statements directed at the attorneys required by law to appear on child welfare cases constitutes conduct that was at least negligent, and runs afoul of Canon 3 of the Code of Judicial Conduct. Utah Code of Judicial Conduct, Canon 3. First, Canon 3 requires a judge to give precedence to his or her judicial duties over all other activities of the judge. Id. at Canon 3A. Next, in a series of related provisions, Canon 3 requires a judge to perform all judicial duties without

bias or prejudice, id. at Canon 3B(5); be patient and courteous to all persons with whom he or she deals in a judicial capacity, including lawyers, id. at Canon 3B(4); and disqualify himself or herself in any proceeding where the judge's impartiality might reasonably be questioned, including situations in which the judge has a personal bias or prejudice concerning a party or a party's lawyer. Id. at Canon 3E(1); 3E(1)(a).

¶ 84 In this case, Judge Anderson created a circumstance where he allowed his non-judicial activities, namely his federal action against the Director of the Office of the Guardian ad Litem, to take priority over his judicial duty to hear child welfare cases. He did so by treating the Director, the attorneys in her office, and the attorneys of the Attorney General's office with considerable disrespect, creating a continuing situation where his impartiality might reasonably be, and was, repeatedly questioned.

¶ 85 This "unjudicial conduct" was also dramatically prejudicial to the administration of justice, because it created, in the words of the presiding judge of Judge Anderson's district, a "horrendous and appalling impact on the ability of the Third District Juvenile Court to meet its statutory obligations to hear cases" in that it was "administratively impossible for another juvenile court judge to assume Judge Anderson's cases" under the circumstances.

¶ 86 Finally, Judge Anderson's disastrous choices regarding retaliation against lawyers from the Office of the Guardian ad Litem, including its Director, and the office of the Attorney General, has unquestionably "brought a judicial office into disrepute." Judge Anderson has promoted the public discussion of his dispute with the attorneys he accuses of attempting to improperly remove him from office. His actions have been widely reported. The activities of this court, as a result of the referral from the Judicial Conduct Commission, have brought more exposure of the dispute. As he has acknowledged before this court, his charges were too broadly made, made as a result of emotional and ill-advised conclusions, and have wrongfully impugned the integrity and competence

of a large group of lawyers with whom he had, and has, no reasonable basis for dispute.

¶ 87 This behavior by Judge Anderson constitutes conduct prejudicial to the administration of justice which brings a judicial office into disrepute, as we have defined that phrase here and in *Worthen.* Judge Anderson merits discipline as a result.

¶ 88 Appropriate discipline in a case such as this is not an easy matter to resolve. The purpose of judicial discipline is three-fold. First, judicial discipline discourages improper behavior by judges, given that they are public officials, sworn to uphold the law, and subject to limited avenues of correction. Second, judicial discipline affords an errant judge both cause and opportunity to correct misbehavior that is correctable. Third, and most importantly, judicial discipline protects the integrity of the judicial system in the interests of the people it serves, the people of Utah. In deciding on the measure of sanction a particular matter requires, the Judicial Conduct Commission must consider these purposes, and the comparative severity of the conduct being sanctioned, among other issues. We, of course, must do the same.

¶ 89 In the case of Judge Anderson, he has made choices that placed his individual interests in the way of performing the duties for which he was appointed. He has severely impaired his ability, and the ability of the entire Third District Juvenile Court, to do its job for a period of more than three years. In other words, for more than half of his current six-year term of office, he has not done the job he was appointed and retained to do. In the interim, he has continued to enjoy the emoluments of office, and to pursue a course of action that never presented a reasonable likelihood of quick resolution. Even at this late date, he continues to attribute his difficulties to others, and has failed to take any effective action to relieve the impasse he has created at the expense of others. Although he did propose a qualified and self-justifying apology once notified by this court that he was in serious jeopardy of being removed from office, he also admits that he cannot now undo the mess he has made.

¶ 90 Judge Anderson's past behavior, especially when considered in light of current circumstances, suggests no easy solution. The integrity of the judiciary, the interests of the people of Utah, and the past behavior of Judge Anderson all require a severe sanction, one that will correct the problem if possible. We see no alternative but to remove Judge Anderson from his office as a juvenile court judge. Any sanction short of removal will neither correct the damage done to the judiciary nor restore Judge Anderson to the proper level of function and dignity that his office requires.

## X. CONCLUSION

¶ 91 Based upon the findings, conclusions, and order of the Judicial Conduct Commission, we hold that Judge Anderson has violated his obligations as a judge, specifically in that he failed to hold adjudication hearings in a timely manner, and held two cases under advisement for a period in excess of two months. This action constituted a pattern of disregard and indifference to the law in violation of both Judge Anderson's oath of office and the Code of Judicial Conduct, which requires judges to respect and comply with the law, resulting in conduct prejudicial to the administration of justice which brings a judicial office into disrepute. More importantly, we also conclude, based upon the facts and evidence adduced by the proceedings before the special master, that the direct consequences of those violations also include the creation, by Judge Anderson, of circumstances which have prevented him from performing his duties as a juvenile court judge for a period of years, and that this behavior by Judge Anderson also constitutes conduct prejudicial to the administration of justice which brings a judicial office into disrepute. As such, we modify the order of the Judicial Conduct Commission, and order that Judge Joseph W. Anderson be, and hereby is, removed from his office as a juvenile court judge, effective immediately.

¶ 92 Chief Justice DURHAM, Justice WILKINS, Justice PARRISH, and Justice NEHRING concur with the opinion of the court.

DURRANT, Associate Chief Justice, concurring in part and dissenting in part:

¶ 93 I agree with the conclusion of my colleagues that Judge Anderson's public accusations have prejudiced the administration of justice and imposed a substantial burden on the judges in the Third District Juvenile Court. I disagree, however, that this court is empowered to remove Judge Anderson from office for conduct that was neither considered by the Judicial Conduct Commission nor a basis for the Commission's recommended sanction.

¶ 94 The complaints the Guardian ad Litem filed with the Commission alleged that Judge Anderson had, on numerous occasions, failed to meet statutory deadlines. After appropriate investigation into and hearings regarding these complaints, the Commission ultimately found that the judge had been untimely in eleven specific instances and recommended that he be publicly reprimanded for these failures. These findings of tardiness, while significant and warranting sanction, have now been dwarfed, in terms of any prejudicial effect on the administration of justice, by Judge Anderson's retaliatory response to the Commission proceedings concerning them. Indeed, it is this response that now serves as the principal basis for my colleagues' decision to remove Judge Anderson from office. In other words, Judge Anderson is not being removed because he made decisions in an untimely manner, but rather because he made public accusations against the offices of attorneys who frequently appear before him, thereby rendering himself disqualified from hearing the bulk of the cases a juvenile court judge must hear.

¶ 95 I do not dispute that these public accusations *relate* to the proceedings before the Commission. They were, in fact, made in direct response to the complaints made with the Commission, a linkage that my colleagues consider adequate to justify removal under article VIII, section 13. But while it is true that in the past, when determining whether to accept or modify a sanction recommended by the Commission, we have considered a judge's attitude in response to the Commission proceeding and any efforts by the judge to remedy the problem, my colleagues go far beyond that here. Rather than merely considering the aggravating or mitigating effect of Judge Anderson's public accusations, my colleagues now rely upon those accusations as the principal justification for his removal. Thus, we remove Judge Anderson today for conduct that played no role in the Commission proceeding and that had no bearing upon the sanction recommended by the Commission. This I believe we are not empowered to do.

¶ 96 As the court of last resort in this state, we are privileged with vast power. Attendant to that power, however, is an obligation to carefully police ourselves in its exercise. We have only that authority the constitution grants us, and we must be rigorous in limiting ourselves to the bounds set by that document.

¶ 97 In my view, the parameters of our authority to discipline judges are fully and exclusively defined by article VIII, section 13.[1] Section 13 empowers the Judicial Conduct Commission "to investigate and conduct confidential hearings regarding complaints against any justice or judge," and to order a sanction. It is only following such an order that our jurisdiction is invoked: "Prior to the implementation of any commission order, the Supreme Court shall view the commission's proceedings as to both law and fact." In conducting this review, we are authorized to "permit the introduction of additional evidence." We are further authorized to implement, reject, or modify the Commission's order.

¶ 98 My colleagues take the position that the authority conferred upon us by section 13 to take additional evidence authorizes us to impose a sanction based on that evidence. I believe this to be true, *provided* the additional evidence serves to support or undermine the charges filed with the Commission. Thus, in this case, we were clearly authorized to take additional evidence to determine

---

1. I do not believe that we have the inherent authority to discipline judges. Moreover, I agree with the implication of my colleagues that the legislature cannot, as it has purported to do by statute, confer upon us power that it does not itself possess.

whether or not the findings of tardiness made by the Commission were adequately supported, to assess the causes of that tardiness, or to determine whether Judge Anderson's pattern of untimeliness was aberrational relative to that of other juvenile court judges. But inasmuch as our authority is limited to *reviewing* the Commission's proceedings, I do not agree that our license to take additional evidence qualifies as a basis upon which we may remove Judge Anderson in this case, given that such additional evidence concerned conduct that was neither considered nor relied upon by the Commission in its proceedings.

¶ 99 The extent of our authority under section 13 is concededly uncharted territory, and my colleagues' interpretation of that section is not unreasonable. I believe, however, that my reading more closely comports with the language and purpose of the section. Moreover, given that we are the final arbiters of our authority, if we are to err it should be on the side of judicial restraint. To be certain, my colleagues are motivated by their sincere concern for the judiciary and the parties and attorneys who appear in our juvenile courts. The problem created by Judge Anderson's public accusations and his resulting disqualifications is perplexing and its consequences far reaching, and it is no doubt more efficient for us to resolve the matter directly without it first being considered by the Commission. But I believe that our constitution requires that the Commission investigate and hold hearings on allegations of judicial misconduct in the first instance. Merely because a problem exists does not necessarily mean that we are empowered to remedy it. Rather, it must be addressed through the constitutionally prescribed channel. Consequently, it is my view that if a complaint is filed with the Commission based on Judge Anderson's public accusations, and the Commission issues a sanction order based on that complaint, then and only then are we empowered to address those charges. As this view differs from that of my colleagues, I respectfully dissent.

¶ 100 I do wish to note, however, my agreement with certain issues appropriately reached by the majority opinion even under my interpretation of the scope of our constitutional authority. I agree with the majority's analysis regarding the constitutionality of the Judicial Conduct Commission as it is presently constituted, the process employed by the Commission in considering the charges asserted against Judge Anderson, the ability of our court to impartially review Commission recommendations, our authority to appoint a special master, the failure by Judge Anderson to meet statutory deadlines as a permissible basis for the Commission proceedings, the propriety of Judge Bench's recusal, and the fairness and neutrality of the Commission. Accordingly, I concur as to parts VII.A–E and VIII.B of the majority opinion, and dissent as to the remainder.